IN THE MATTER OF THE APPLICATION OF PENNSYL-
VANIA & NEWARK RAILROAD COMPANY FOR THE
CANCELLATION OF TAX ASSESSMENTS FOR THE
YEARS 1906 THRU 1956, INCLUSIVE, MADE BY THE
DIRECTOR OF TAXATION OF THE STATE OF NEW
JERSEY.

Argued October 26 and 27, 1959—Decided November 23, 1959.

148

*Mr. David M. Satz, Jr.,* Deputy Attorney General, argued the cause for appellant (*Mr. David D. Furman,* Attorney General of New Jersey, attorney; *Mr. Stephen F. Lichenstein* and *Mr. Robert E. Frederick,* Deputy Attorneys General, on the brief).

*Mr. Edward J. O'Mara* argued the cause for respondent (*Messrs. O'Mara, Schumann, Davis & Lynch,* attorneys; *Mr. Stephen VR. Strong,* of counsel; *Mr. James A. Hession,* on the brief).

The opinion of the court was delivered by

FRANCIS, J. The State Division of Tax Appeals cancelled certain tax assessments imposed upon the Pennsylvania & Newark Railroad Company for the years 1906 through 1956 by the Director of the Division of Taxation. An appeal was taken to the Appellate Division and we certified it before argument there.

On December 19, 1905, the Pennsylvania & Newark Railroad Company (hereafter called P & N) was granted a corporate franchise under *L.* 1903, *c.* 257 (*R. S.* 48:12-1

*et seq.*), an act providing for the establishment of railroad companies. The Secretary of State was not permitted to accept such a certificate of incorporation for filing unless an affidavit was appended thereto signed by at least five of the directors, reciting an intention in good faith "to construct, maintain and operate the road mentioned in the certificate." *R. S.* 48:12–8. In the present controversy the Director does not dispute that the franchise was sought and obtained in good faith for the purposes set out in the statute. The corporation was a wholly owned subsidiary of the Pennsylvania Railroad Company. It was organized to construct and operate a railroad from Trenton-Morrisville to connect with the Pennsylvania Railroad facilities near Elizabeth, New Jersey.

The legislation required a deposit with the State Treasurer of $2,000 for each mile of the proposed route, to be held by him until construction or abandonment of the road. *R. S.* 48:12–8, 25, 40. Such a deposit was made at intervals so that by December 27, 1917, $84,400 had been posted. That sum remained with the Treasurer until December 10, 1956, when it was returned. Necessary surveys of the route and several amended descriptions and surveys thereof were filed with the Secretary of State. *R. S.* 48:12–24. Between 1906 and 1929, P & N purchased at least 71 parcels of land and in 1918 acquired one tract by condemnation. The authority to condemn was an incident of the railroad franchise. Over the period of its corporate existence, down to 1955, 40 pieces of land were sold with the approval of the Board of Public Utility Commissioners. Certain bridge piers necessitating an expenditure of $272,775.93 were erected from 1906 through 1916. They were demolished between 1931 and 1938 at a cost of $80,332.56. The corporation received $206,000.46 as real estate rental from 1905 through 1954. The record does not disclose the specific property rented or the use to which it was put. Over the years, as the real estate was acquired along the route, it was assessed locally by the various municipalities and taxed accordingly.

During its entire corporate life, P & N filed with the Secretary of State the annual reports required of every domestic corporation. *N. J. S. A.* 14:6–2. One of the statements called for is "the character of its business." The Director has stipulated that each report set out the business as "railroad and transportation."

Section 14 of the Railroad Act of 1903 provided that the grantee of the franchise shall commence the proposed railroad within six months from the date of its organization and that where the road is not more than 50 miles in length at least one track shall be opened and completed within two years of the commencement. *R. S.* 48:12–29. On failure to do so, the holder "shall forfeit * * * the franchises." *R. S.* 48:12–30. Apparently the forfeiture was not intended to be automatic. The same section says that if any part of the road is not constructed "within the time allowed by law" and thereafter another company files a survey of a location crossing or occupying that portion, the latter company shall have priority over such location. *Cf. Brummitt v. Snow Hill Ry. Co.,* 197 *N. C.* 381, 148 *S. E.* 444 *(Sup. Ct.* 1929); *Mylrea v. Superior & St. C. R. Co.,* 93 *Wis.* 604, 67 *N. W.* 1138 *(Sup. Ct.* 1896); *Combes v. Milwaukee & M. R. Co.,* 89 *Wis.* 297, 62 *N. W.* 89, 27 *L. R. A.* 369 *(Sup. Ct.* 1895); and see *contra Hanbury v. Metropolitan Securities Co.,* 215 *App. Div.* 225, 213 *N. Y. S.* 555 *(App. Div.* 1926), appeal dismissed 253 *N. Y.* 527, 171 *N. E.* 767 *(Ct. App.* 1930).

During the entire period from incorporation to November 16, 1954, when the directors adopted a resolution for the dissolution of P & N, no track was laid and, of course, no transportation was ever engaged in. It is undisputed, however, that commencing as far back as 1878 (*L.* 1878, *c.* 13, *p.* 23) the Legislature passed a series of acts extending for an additional period, at first three years and later two years, the time for the completion of any railroad authorized to be constructed. The last of these enactments was in 1953. *L.* 1953, *c.* 99. (Legislation of this type was not peculiar

to New Jersey. See *State v. Twin Village Water Co.*, 98
*Me.* 214, 56 *A.* 763 (*Sup. Jud. Ct.* 1903); *New York &
L. I. R. Co. v. O'Brien*, 121 *App. Div.* 819, 106 *N. Y. S.*
909 (*App. Div.* 1907), affirmed 192 *N. Y.* 558, 85 *N. E.*
1113 (*Ct. App.* 1908); *Hanbury v. Metropolitan Securities
Co., supra.*)

After January 1, 1886, the extensions applied only to
those companies which had expended moneys in surveys or
location of route, or in acquisition of right of way or in
construction. See, *e. g., L.* 1953, *c.* 99; *L.* 1937, *c.* 13.
They were made dependent also upon the filing in the office
of the Secretary of State of a waiver approved by the Gov-
ernor and the Attorney General of any special charter pro-
vision relating to taxation; and an agreement to be bound
by any general law of New Jersey for the taxation of rail-
road corporations. *L.* 1953, *supra, section* 1. In the early
years P & N filed such documents biennially but after 1919
that burden was removed and the new extension was given
on the basis of the waiver agreement already on file. *L.* 1921,
*c.* 34. The effect of each successive enactment was a waiver
by the State of the default or nonuser of the franchise and
to keep the company viable for the additional period. *Point
Breeze Ferry & Imp. Co. v. Bergen Neck Ry. Co.*, 53 *N. J. L.*
108 (*Sup. Ct.* 1890); *New York & L. I. R. Co. v. O'Brien,
supra; Brummitt v. Snow Hill Ry. Co., supra; Mylrea v.
Superior & St. C. R. Co., supra.* There can be no doubt
that such was the lawmakers' intention. Not only does the
clear language so indicate but since the acts are all the
same, the introducer's statement on one of them confirms
that conclusion. The statement attached to *L.* 1939, *c.* 15,
says:

"Under section 14 of the general railroad act of 1903 and gen-
erally under special charters, railroad companies are obliged to
complete their railroads within a limited time under penalty of for-
feiture of their franchise. The purpose of this bill is to extend for
a further period of two years the time for the completion of certain
railroads referred to in the bill."

As has been indicated, P & N never completed its railroad nor laid any tracks. It neither filed reports as required by the Railroad Tax Act, *R. S.* 54:23–1[1], nor paid any taxes as a railroad, *R. S.* 54:19–1 *et seq.*[1] or 54:24–1 *et seq.*[1], or *N. J. S. A.* 54:29A–1 *et seq.*, nor did it ever pay taxes under the Capital Stock Tax Act, *R. S.* 54:13–1 *et seq.* or the successor law, the Corporation Business Tax Act of 1945, *N. J. S. A.* 54:10A–1 *et seq.* The only taxes paid over the years were those assessed by the local municipalities on the land that it had acquired.

On November 16, 1954 a resolution of dissolution was adopted. It recited that the railroad had not been constructed. On December 28, 1954, P & N filed a certificate of abandonment of the line with the Secretary of State and requested return of the $84,400 deposit. *R. S.* 48:12–40. On December 14, 1955 the Board of Public Utility Commissioners approved the sale of its remaining lands. The taxing authorities, having discovered that no state taxes had been paid, concluded that since P & N had never actually completed and operated a railroad, it should be assessed for the entire years of its existence from 1906 through 1956 as a general business corporation, first under the Capital Stock Tax Act, *supra,* and then under the replacement law, the Corporation Business Tax Act of 1945, *supra.* The annual tax assessments ranged from $125 for 1906 and 1907, $360 for 1908 through 1910, $390 for 1911 through 1945, and, after the adoption of the 1945 act, in various amounts from $1,085.73 for 1946 to $2,573.91 for 1956. The total for the 51-year period is $29,704.01. Interest, imposed at 6% per year, amounted to $31,322.23, bringing the asserted liability to $61,026.24.

P & N conceded that it was and is subject to taxation under the Railroad Tax Act, *supra,* but denied liability as a general business corporation. It pointed out that by specific provision of the Capital Stock Tax Act and the Cor-

---

[1] Repealed, *L.* 1941, *c.* 291, § 75.

poration Business Tax Act, railroad corporations are exempt from assessment thereunder. *R. S.* 54:13–1; *N. J. S. A.* 54:10*A*–3. The Director of the Division of Taxation rejected that view and imposed assessments as outlined above. Thereupon the taxes were paid under protest, the $84,400 deposit was returned by the Treasurer, and on December 21, 1956 the Secretary of State issued the certificate of dissolution to P & N. An appeal was then taken to the State Division of Tax Appeals, which vacated the assessments, holding that P & N was a railroad corporation and as such exempt from them.

The case has a surface difficulty which appears to invest the position of the Director with more substance than is warranted. It arises from the fact that although P & N held a railroad franchise for 51 years, it took no steps in furtherance of construction of the road beyond those that have been set out above, and it paid no taxes as a railroad. Undoubtedly if, throughout the successive two-year extensions of time for completion, annual taxes had been paid, the controversy as to which tax statute controlled would never have arisen. The Director claims that the criterion for determining the applicable statute is whether P & N ever operated as a railroad, in fact. In other words, the suggestion is that the Legislature intended to make taxation as a railroad depend upon completion of construction and use for transportation purposes. But this cannot be so. The mandate of *R. S.* 48:12–29 is that where the road is not more than 50 miles in length, one track must be opened and completed within two years. On the thesis of the Director, the corporation could not be taxed as a railroad during the time required for completion and operation; it would have to be treated as a general business corporation. Manifestly, no such chameleon-like creature was envisaged by the Legislature for tax purposes. And no cases have been presented to us which support such a claim. The Railroad Tax Law of 1948 provides further persuasion against the contention. It defines a railroad as "any common carrier by

railroad engaged in, owning or *constructing* facilities for, the transportation of persons or property in or through this State." *N. J. S. A.* 54:29A-2 (emphasis added).

Moreover, the Legislature had the power to waive the forfeiture of the charter on account of the failure to complete construction within the time limited and to grant further time. *Brinkerhoff v. Newark & Hackensack Traction Co.,* 66 *N. J. L.* 478, 482 (*Sup. Ct.* 1901). Ordinarily, a public utility franchise is not forfeited through nonuser. When it is granted to a corporation, an obligation arises to make it effective by serving the public. If this duty is not complied with, the State, by appropriate action through the Attorney General, may compel performance or seek forfeiture of the franchise. *Jersey City Gaslight Co. v. Consumers Gas Co. of Jersey City,* 40 *N. J. Eq.* 427, 431 (*Ch.* 1885); *The State v. Paterson & Hamburg Turnpike Company,* 21 *N. J. L.* 9 (*Sup. Ct.* 1847); *State v. Twin Village Water Co., supra; A. D. Graham & Co. v. Pennsylvania Turnpike Commission,* 347 *Pa.* 622, 33 *A. 2d* 22, 30 (*Sup. Ct.* 1943); *State ex rel. Vilter Mfg. Co. v. Milwaukee, B. & L. G. R. Co.,* 116 *Wis.* 142, 92 *N. W.* 546 (*Sup. Ct.* 1902); *Mylrea v. Superior & St. C. R. Co., supra; Combes v. Milwaukee & M. R. Co., supra;* 74 *C. J. S. Railroads* § 18(6); 1 *Elliot on Railroads* (1897) § 48. In this case the Legislature acquiesced explicitly in the delay of P & N and any other railroad company similarly situated, and kept its franchise alive by means of the extending acts. *Brummitt v. Snow Hill Ry. Co., supra.* The record does not reveal the reason for the patience but, in any event, that is a legislative matter. It is not a subject for judicial inquiry. It may be that the lawmakers recognized that the business prospects of such lines continued to be potential rather than actual and felt that further time to complete construction ought to be allowed. *Cf. State v. Twin Village Water Co., supra.* Can it be said that our courts would have sanctioned an action by the Attorney General seeking a judgment of forfeiture of the franchise during any one of the two-year periods

in the face of the express grant of further time by the Legislature? That which could not be done directly ought not to be done collaterally. *Brinkerhoff v. Newark & Hackensack Traction Co., supra; State v. Paterson & Hamburg Turnpike Company, supra.* It would be incongruous indeed for us to hold that for taxation purposes P & N died aborning, that it never had any existence as a railroad in spite of its legal birth and steady stream of life-perpetuating acts by the one branch of government which possessed the authority to keep it in being.

The good faith of P & N in seeking and accepting the corporate status of a railroad is conceded. The biennial extenders were accepted and the necessary documents were filed in order to qualify for the additional time. The annual reports showing the continued existence of the corporation and the current officers and directors were submitted to the Secretary of State. And no demand was ever made prior to dissolution for the return of the $84,400 deposit—the interest on which in ordinary investment would have been more than sufficient annually to pay the tax now sought to be imposed. The agreed facts do not reveal that any independent business venture was undertaken. In this connection the Director points to the total rents of $206,000 received by the corporation on land acquired from 1905 through 1954—roughly $4,000 per year. It is not suggested that this land was not located along the laid out route or for railroad purposes. The list of municipalities to which local taxes were paid clearly indicates the properties followed that course. Nor is it suggested that the rentals did not represent a continuance of the existing use at time of purchase as a business expedient pending acquisition of the complete right of way. The stipulation shows further that at least 70 parcels of land were bought at various times. Although the total purchase price does not appear, the sum, if invested at a reasonable rate over the life of P & N, probably would have produced at least as much as the aggregate rentals. Moreover, in excess of $350,000 was spent for the construc-

tion and demolition of the bridge piers between 1906 and 1938. (Whether there was any salvage does not appear.) It is not an unreasonable assumption to say that such sum, if put to investment purposes, would have returned as much as the average annual rental of the lands. Any fair appraisal of the enterprise demonstrates that it was not a profitable one and not at odds with the conceded original good faith motive to build a railroad. The matter was submitted to the Division of Tax Appeals for decision on a stipulation of the facts which we have outlined. The claim of the Director was that P & N was subject to taxation as a general business corporation for its entire life, *i. e.,* from 1906 through 1956, when it was dissolved. Confronted with the legislative history and the agreed facts, the Division decided that the taxpayer had not lost its status as a railroad for taxation purposes and so vacated the assessments. We find no sufficient basis in the record for disturbing that declaration. In reaching this conclusion, however, it may be noted that we express no opinion as to whether, in a proper factual setting for tax purposes, a finding of abandonment of a railroad franchise could not be made. On this record, in our opinion, the legislative extender acts are the determinative factors and they must be respected as solemn deliberative acts of a coordinate branch of the government.

Affirmance of the action of the Division does not mean that the railroad is relieved of a proper tax burden. Its liability over the years for unpaid taxes as a railroad is admitted. Their computation is not a matter for consideration in this proceeding. It is assumed that the Director will now proceed to assess them.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.