712 A.2d 653

IN THE MATTER OF ALLEGED VIOLATIONS OF LAW BY VALLEY ROAD SEWERAGE COMPANY, RICHARD H. SCHINDELAR, INDIVIDUALLY AND AS OFFICER, DIRECTOR AND SHAREHOLDER AND MARJORIE Z. SCHINDELAR, INDIVIDUALLY AND AS OFFICER AND DIRECTOR.

STATE OF NEW JERSEY, BOARD OF PUBLIC UTILITIES, PLAINTIFF–RESPONDENT, v. VALLEY ROAD SEWERAGE COMPANY, A NEW JERSEY PUBLIC UTILITY, RICHARD H. SCHINDELAR, INDIVIDUALLY AND AS OFFICER, DIRECTOR AND SHAREHOLDER AND MARJORIE Z. SCHINDELAR, INDIVIDUALLY AND AS OFFICER AND DIRECTOR, DEFENDANTS–APPELLANTS.

Argued January 5, 1998—Decided June 12, 1998.

226

*Michael E. Rodgers* argued the cause for appellants (*Pinto, Rodgers & Kopf,* attorneys).

*Elise W. Goldblat,* Deputy Attorney General, argued the cause for respondent New Jersey Board of Public Utilities (*Peter Verniero,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Sarah H. Steindel,* Deputy Attorney General, on the brief).

*Anthony R. Francioso,* Assistant Deputy Ratepayer Advocate, argued the cause for respondent Division of Ratepayer Advocate (*Blossom A. Peretz,* Ratepayer Advocate of New Jersey, attorney; *Ms. Peretz,* of counsel).

*Frank N. Yurasko* argued the cause for respondent Township of Hillsborough.

The opinion of the Court was delivered by

POLLOCK, J.

This appeal questions the decision of the Board of Public Utilities (BPU) to revoke the franchise of Valley Road Sewerage Company (Valley Road), a small, privately owned sewerage com-

pany, and to seek the appointment of a receiver to sell Valley Road. The appeal also questions the order of the Chancery Division appointing the receiver. The Appellate Division affirmed both orders. 295 *N.J.Super.* 278, 284, 685 *A.*2d 11 (App.Div.1996). We granted Valley Road's petition for certification, 151 *N.J.* 71, 697 *A.*2d 544 (1997), and now affirm.

## I.

The parties do not dispute the essential facts. Valley Road collects and treats sewage from approximately 623 homes in Hillsborough and Tewksbury Townships, New Jersey. Two plants, known as the River Road and Fieldhedge Drive Treatment Plants, serve approximately 547 residential customers in Hillsborough. The Pottersville Treatment Plant serves approximately 76 customers in Tewksbury.

Until his death in December 1996, Richard Schindelar was Valley Road's chairman of the board of directors, president, and sole shareholder. Schindelar's wife, Marjorie, served as a director and as Valley Road's corporate secretary. We collectively refer to Valley Road, Richard Schindelar, and Marjorie Schindelar, as "Valley Road." None of the Schindelars' children live in New Jersey or have ever been involved in the company.

Schindelar established Valley Road in 1962 to treat the sewage from certain residential developments. After constructing the system, the developers donated the system to Valley Road. The BPU approved Valley Road's franchise in 1966. Other than Schindelar, who was responsible for the day-to-day operations of Valley Road, the company employed only two employees, a day laborer and a part-time secretary.

From its inception, Valley Road has been beset with financial, managerial, and environmental problems. Notwithstanding rate increases in 1979 and 1984, the company has never operated at a profit. Yet, its rates exceed substantially those charged by the Hillsborough Township Municipal Authority (HTMUA), which serves customers in adjacent areas of Hillsborough Township. As

of February 1993, moreover, Valley Road's financial records reflected "negative retained earnings," or a cumulative deficit, of two million dollars. Its liabilities included "loans" in excess of $760,-000 owed to Schindelar, accrued but unpaid "salary" totaling approximately $200,000 owed to him, past due Franchise and Gross Receipts Taxes totaling over $400,000 due the State of New Jersey, and municipal taxes totaling approximately $94,000 due the Township of Tewksbury.

Most of the company's extensive environmental violations have arisen from its failure to correct a serious inflow and infiltration (I & I) problem with its sewerage collection system. During periods of wet weather, large amounts of surface and ground water infiltrate the company's sewerage collection lines, causing the flow of wastewater entering the treatment plants to exceed design capacity. As a result, the effluent discharged by the plants has contained levels of pollutants that exceed requisite permit levels (effluent limits). Valley Road has known of the I & I problem since the mid–1970s when the New Jersey Department of Environmental Protection, Division of Water Resources (DEP) discovered that the Fieldhedge Drive Plant had "severe infiltration/inflow problems in the sewerage collection system." The I & I problem caused wastewater flows "grossly exceeding its design capacity and permit flow limitations."

For over 20 years, Valley Road has incurred extensive fines and penalties resulting from its broken promises to correct the I & I problem. In 1978, Valley Road promised the DEP that it would correct several violations, including those arising from I & I. Valley Road, however, failed to make the corrections. In September 1979, the DEP fined Valley Road $2,000, finding:

> As a direct result of the failure by Valley Road to undertake the corrective actions required by the [DEP], there has occurred and is continuing to occur an unlawful discharge of improperly and inadequately treated wastewater from Valley Road's Fieldhedge Plant into the waters of the State, specifically a tributary to Royce Brook which flows into the Millstone River, a potable water supply source....

Similarly, in 1985, Valley Road entered into an Administrative Consent Order (ACO) with the DEP to resolve penalty assess-

ments in 1983 for violations at River Road and Fieldhedge Drive Plants. In the ACO, Valley Road agreed to pay $12,600 in penalties and to undertake a number of remedial measures, including replacing Schindelar with a full-time plant operator, filing for a rate increase, and hiring an independent contractor to correct the I & I problem. Consequently, the company hired a plant manager and received a substantial rate increase. Yet, Valley Road failed to hire the contractor to fix the I & I problem. Schindelar, moreover, became "dissatisfied" with the plant manager's performance. In violation of the ACO, Schindelar resumed control over Valley Road's operations in July 1991. Because the I & I problem continued to cause effluent limit violations, the DEP assessed Valley Road with $660,000 in penalties in 1992.

Valley Road remains at risk of incurring additional penalties. The company's New Jersey Pollution Discharge Elimination System permit for the Fieldhedge Drive Plant required that plant's connection to the HTMUA system by November 1987. Connection to the HTMUA system would remedy prohibited discharges from that plant. The company, however, has failed to take the necessary steps to connect to the plant.

In an attempt to negotiate a settlement of its various liabilities, Valley Road has entered into an agreement with the State of New Jersey to settle its tax liability for $160,000. Likewise, the Township of Tewksbury has agreed to accept $25,500 in full settlement of Valley Road's past due tax liability. Both of these agreements, however, are contingent on Valley Road settling with the BPU, a contingency that remains unsatisfied. Additionally, the DEP has drafted ACOs that would, among other things, settle Valley Road's outstanding penalty assessments for $118,750. The draft ACOs, however, are based on the BPU's agreement to the terms of a proposed "business plan," described in greater detail below (*infra* at p. 233). In a letter dated August 11, 1994, the DEP indicated that if a settlement was not reached between the DEP and Valley Road by January 1, 1995, the DEP "intend[ed] to

pursue additional enforcement action in this matter as it deems appropriate." To date, the ACOs have not been executed.

In 1992, Valley Road filed a petition for a rate increase. At a public hearing in Hillsborough Township on February 25, 1993, approximately 300 Valley Road customers appeared. Eighteen customers spoke in opposition to the increase, as did a lawyer appearing on behalf of the Rutgers Environmental Law Clinic and Hillsborough Township. The record does not reflect that anyone spoke in favor of the increase.

The Administrative Law Judge (ALJ) recommended the denial of any rate increase, stating that Valley Road presented the "most egregious example[ ] of corporate mismanagement [he] had [ever] witnessed," and that "the existing management ha[d] failed for the past twenty years" to provide "safe, adequate, and proper service to its customers." He concluded:

> In over 23 years of practicing in the area of utility regulation, I have never seen an instance of such managerial dereliction which has resulted in the disastrous financial and operational condition that the Valley Road Sewerage Company now finds itself in. While finding no evidence of willful misconduct on the part of management it is nonetheless apparent that for the Board to grant any rate increase at this time would be inappropriate and totally inadvisable.

The BPU adopted the ALJ's Initial Decision recommending denial of the rate increase. Like the ALJ, the BPU concluded that Valley Road's management was so incompetent that it could not be trusted to take the necessary remedial action, even if it received the requested rate relief. The Appellate Division found that the record amply supported that finding. *In re Valley Road Sewerage Co.*, 285 *N.J.Super.* 202, 208, 666 *A.*2d 992 (App.Div. 1995).

In affirming the denial of rate relief, the Appellate Division recited Valley Road's precarious financial position and "appalling record of environmental violations." *Id.* at 207, 666 *A.*2d 992. The court noted Valley Road's "chronic problems with 'infiltration and inflow' of excessive amounts of extraneous water, such as groundwater and sump pump discharge, into its sewage collection system." *Ibid.* Stating that "[DEP] penalty assessments contin-

ue to be imposed at an alarming rate," the court referred to Valley Road's agreement to an administrative consent order "to pay over $12,000 in penalties for numerous violations at the company's River Road and Fieldhedge Drive plants." *Ibid.* Similarly, the court observed that Valley Road had failed to submit a plan to remedy its I & I problems, which was a condition to DEP's agreement to reduce the $660,000 in penalties. *Ibid.* Contrary to a condition on the permit to operate its Fieldhedge Drive plant, moreover, Valley Road failed to cease operations by November 1, 1987.

After denying Valley Road further rate relief, the BPU ordered hearings on the revocation of Valley Road's operating authority "for failure to render safe, adequate and proper service...." In response, Valley Road proposed a "business plan," which called for the relinquishment of managerial control to an independent contractor acceptable to the BPU, execution of consent orders with the DEP to settle environmental issues and fines, execution of agreements with the Division of Taxation and Tewksbury to settle all tax claims, and approval of a rate increase from $375 per year to $827 per year.

In its Decision and Order of November 4, 1994, the BPU found that the business proposal was "too little, too late, and too costly." Supporting that decision were the Board's findings regarding Valley Road's precarious financial condition, its non-compliance with applicable legal and environmental requirements, and Schindelar's decision to use tax monies due the State and the Township of Tewksbury as a "credit source." Although Valley Road was still serving its customers, the BPU was wary about the company's continuing ability to provide such service. Additionally, the BPU found that it would be "blatantly unfair to allow current management to retain its franchises and operating authority while attempting to remedy years of managerial neglect at the expense of its ratepayers." Accordingly, the BPU directed the Attorney General to seek the appointment of a custodial receiver to operate the company and to sell it to a qualified buyer. On appointment of

the receiver, the BPU revoked Valley Road's franchise and barred the Schindelars from owning or operating another public utility.

In an unpublished opinion, Assignment Judge Wilfred P. Diana, sitting in the Chancery Division, sustained the BPU's request. Judge Diana reasoned that the appointment of a receiver was necessary to implement the BPU's revocation of Valley Road's franchise and the removal of the Schindelars from the management and ownership of Valley Road. Concerning the sale of Valley Road's assets, the Chancery Division order stated:

> The receiver is directed to solicit proposals for the acquisition of the Company or its assets by a qualified buyer or buyers, and shall promptly notify [the] court and the Board of Public Utilities of all such proposals. The receiver shall provide at least sixty days notice and a copy of any proposal to the court, all known creditors and other interested parties. Any objections to or comments on the proposed sale shall be submitted to the court within said sixty day period after which the court shall render its decision on the proposal.

Valley Road requested the court to require the custodial receiver, among other things, to apply for a rate increase that would yield a "reasonable return," and to take other measures aimed at obtaining the "highest possible net return, consistent with the law, from the sale of the company." Those measures included appealing the BPU's denial of any rate increase that did not yield a reasonable rate of return, selling the company at no less than its condemnation value, and postponing any such sale until the company was "put on a sound financial footing." Judge Diana rejected the request stating:

> The receiver's function is not to obtain the highest possible value for the company, but to arrange a sale that is commercially reasonable in light of the Company's current condition. The reasonableness of the proposed sale will be reviewed by the court and the parties hereto at the time of the proposal's submission pursuant to this order.

The Appellate Division affirmed the orders of both the BPU and the Chancery Division. 295 *N.J.Super.* at 284, 685 *A.*2d 11. The court found that substantial credible evidence supported the BPU's findings, *id.* at 286, 685 *A.*2d 11, and that the BPU's rejection of Valley Road's business plan "was not arbitrary and capricious." *Id.* at 287, 685 *A.*2d 11. It also sustained the BPU's implied power to bar the Schindelars from owning or managing a

public utility. *Id.* at 288, 685 *A.2d* 11. Finally, the Appellate Division sustained the Chancery Division's power to appoint an equitable receiver with the power to sell Valley Road's assets. *Id.* at 292–93, 685 *A.2d* 11.

. In its petition for certification, Valley Road questions the BPU's authority to revoke its franchise and to seek the appointment of a custodial receiver with the power to operate and sell the company. It also questions the fairness and reasonableness of the Chancery Division's order of sale.

## II.

We first address Valley Road's contention that the BPU lacks authority to revoke its franchise and to seek the appointment of a custodial receiver with the power to operate and sell the company. The New Jersey Legislature has vested the BPU with "general supervision and regulation of and jurisdiction and control over all public utilities ... and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions of [Title 48 of the New Jersey Statutes]." *N.J.S.A.* 48:2-13. The BPU's authority extends not only to the corporate entity, but to "every individual ... that now or hereafter may own, operate, manage or control" the utility. *Ibid.* This sweeping grant of power is "intended to delegate the widest range of regulatory power over utilities to the [BPU]." *Township of Deptford v. Woodbury Terrace Sewerage Corp.,* 54 *N.J.* 418, 424, 255 *A.2d* 737 (1969). Furthermore, the BPU's authority over utilities, like that of regulatory agencies generally, extends beyond powers expressly granted by statute to include incidental powers that the agency needs to fulfill its statutory mandate. *A.A. Mastrangelo, Inc. v. Commissioner of Dept. of Envtl. Protection,* 90 *N.J.* 666, 683–84, 449 *A.2d* 516 (1982); *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 562, 384 *A.2d* 795 (1978).

The statutory scheme establishes the BPU's authority to revoke Valley Road's franchise. First, *N.J.S.A.* 48:2–14 provides

that "[n]o privilege or franchise granted ... to any public utility by a political subdivision of this State shall be valid until approved by the [BPU]." In approving a privilege or franchise, moreover, the BPU "may impose such conditions as to construction, equipment, maintenance, service or operation as the public convenience and interests may reasonably require." *Ibid.* Implicit in the power to grant a franchise is the power to revoke it for breach of the franchise's conditions. *Board of Pub. Util. Com'rs v. Sheldon,* 95 *N.J.Eq.* 408, 410, 124 *A.* 65 (Ch.1924).

■ Second, *N.J.S.A.* 48:2–40 provides that the BPU "at any time may order a rehearing and extend, revoke or modify an order made by it." This provision encompasses the grant of a franchise to a public utility. *See Township of Deptford, supra,* 54 *N.J.* at 424–25, 255 *A.2d* 737 (holding that under *N.J.S.A.* 48:2–40, BPU had authority to revoke its prior approval of option clause in license granting franchise, which permitted municipal government to purchase franchise at later date for specified sum). We conclude that, whether implied from its authority to approve a franchise or its authority to revoke prior orders, the BPU could revoke Valley Road's franchise rights.

■ Finally, the authority to seek the appointment of a custodial receiver is fairly inferable from the expansive powers that the Legislature has granted to the BPU. Those powers include the authority to require compliance with State and local laws, *N.J.S.A.* 48:2–16(1)(a), to require the provision of safe, adequate, and proper service, *N.J.S.A.* 48:2–23, and to revoke a franchise that fails to provide such service. Fairly inferable is the legislative intent to vest the BPU with the discretion to revoke a franchise and to seek the appointment of a custodial receiver when such action is necessary to ensure the continued provision of safe, adequate, and proper utility service. *Cf. Application of Pennsylvania & Newark R.R. Co.,* 31 *N.J.* 146, 154, 155 *A.2d* 761 (1959) '(stating that state may seek forfeiture of utility franchise that fails to serve public).

In an analogous context, the Legislature has required the BPU and the DEP to consider the acquisition of small water companies. The Small Water Company Takeover Act, *N.J.S.A.* 58:11–59 to – 63, provides:

Whenever any small water company is found ... to have failed to comply, within a specified time, with any order of the [DEP] concerning the availability of water, the potability of water and the provision of water at adequate volume and pressure, ... [the DEP and the BPU] shall, ... conduct a joint public hearing to determine: the actions that may be taken ... including, but not necessarily limited to, the acquisition of the small water company by the most suitable public or private entity.

[*N.J.S.A.* 58:11–59 (footnotes and citations omitted).]

The express grant of power to order the acquisition of small water companies does not detract from the BPU's implicit power to seek the sale of small sewerage companies.

Our research has not uncovered any case, and counsel have not provided us with any, in which the BPU previously has sought to take over a small sewerage company. Perhaps because the failure of small water companies is more common than that of small sewerage companies, the Legislature enacted the more specific provisions of the Small Water Company Takeover Act. Although we conclude that the BPU has the authority to revoke Valley Road's franchise and to seek the appointment of a custodial receiver with the power to sell the utility, we suggest that the BPU promulgate regulations to clarify the exercise of that authority.

### III.

We now turn to the BPU's exercise of its authority. Our review of the BPU's decisions is limited to determining whether sufficient credible evidence exists in the record to support the BPU's findings. *Mayflower Securities Co. v. Bureau of Securities,* 64 *N.J.* 85, 92–93, 312 *A.2d* 497 (1973); *see also N.J.S.A.* 48:2–46 (stating that court may set aside BPU's order, in whole or in part, "when it clearly appears that there was no evidence before the [BPU] to support the same reasonably or that the same was without jurisdiction of the [BPU]."). Similarly, we review the BPU's choice of remedy only for illegality, arbitrariness, or abuse

of discretion. *Mayflower Securities, supra,* 64 *N.J.* at 93, 312 *A.*2d 497.

Valley Road no longer contests the BPU's findings describing the utility's "abysmal" history of violating legal and environmental requirements. Instead, Valley Road questions the BPU's findings that the company's business plan was "too little, too late, and too costly," and that it would be "blatantly unfair to allow current management to retain its franchises and operating authority while attempting to remedy years of managerial neglect at the expense of its ratepayers." Valley Road also contends that revocation of its franchise and appointment of a custodial receiver to operate and sell the company was inappropriate.

■ Ample evidence in the record, however, supports the BPU's rejection of Valley Road's proposed business plan. First, Valley Road has a history of making and breaking promises to regulatory agencies. Consequently, the BPU could question Valley Road's ability to comply with the proposed business plan. Since 1978, Valley Road has promised the DEP that it would correct its I & I problem. Despite two subsequent rate increases, the problem persists. In fact, in its 1985 ACO with the DEP, Valley Road promised, among other things, to hire a full-time plant operator, to file for a rate increase, and to hire an independent contractor to fix the I & I problem. Schindelar, however, eventually retook control of the company because he was "dissatisfied" with the operator's performance. Moreover, despite receiving a rate increase in an amount stipulated by Valley Road as fair and satisfactory, the company never hired the contractor. Given Valley Road's failure to adhere to similar agreements in the past, the BPU's reluctance to agree to Valley Road's business plan was reasonable.

Second, the tax agreements and consent orders in the business plan are contingent on the resolution of the issues in this proceeding. The ACOs, moreover, remain unexecuted. In the absence of executed ACOs, we decline to override the BPU's conclusion that Valley Road has not settled its environmental problems with the DEP.

Nor can we say that the BPU was unfair in preventing Valley Road from imposing on its current customers the cost of decades of neglect. Valley Road insists that none of the proposed rate increases will pay for the costs of its past mismanagement. Yet, Valley Road does not explain how, without substantial rate relief, it plans to raise the funds needed to pay its debts.

Valley Road further maintains that Schindelar's financial mismanagement actually benefitted Valley Road's customers. It argues that by lending the company money instead of seeking rate increases, Schindelar in fact "subsidized" the customers' rates for thirty years. The argument is unpersuasive. Current customers, many of whom never benefitted from Schindelar's "subsidies," would be exposed to a tripling of their rates under Valley Road's proposal.

▮▮▮▮ Given the unique history of this case, the BPU's decision to revoke Valley Road's franchise and to seek the appointment of a custodial receiver to operate and sell the company does not constitute an abuse of discretion. Contrary to Valley Road's contention, moreover, the BPU is not restricted to revoking a utility franchise only on a showing of "willful misconduct." The BPU need not first make a finding of willful misconduct before concluding that a utility is incapable of providing safe, adequate, and proper service. We further reject Valley Road's argument that the BPU may not seek the appointment of a custodial receiver with the power of sale if there is any less onerous remedy available. To assure that a utility provides safe, adequate, and proper service, the BPU must have some latitude in its choice of remedies. We anticipate that only in extreme cases such as the present one will the BPU seek the appointment of a custodial receiver with the power to sell a utility.

## IV.

The remaining question concerns the Chancery Division order appointing the custodial receiver and directing the sale of Valley

Road or its assets. Valley Road asserts that the receiver must put the company on a sound financial footing and correct its environmental problems before proceeding with the sale. We disagree.

As a general rule, a receiver should try to obtain the highest possible price from the sale of property. *Jackson v. Smith,* 254 *U.S.* 586, 588, 41 *S.Ct.* 200, 201, 65 *L. Ed.* 418 (1921). Unlike other corporations, however, utilities are subject to a special obligation to serve the public interest. In particular, the primary obligation of a utility is to provide safe, adequate, and proper service at fair and reasonable rates. *N.J.S.A.* 48:2–21; *N.J.S.A.* 48:3–3. The Legislature has entrusted the BPU with the responsibility of assuring that utilities fulfill that obligation. *N.J.S.A.* 48:2–23. It follows that the sale of a utility or its assets is subject to the utility's statutory obligation to provide safe, adequate, and proper service. Any such sale also is subject to the regulatory authority of the BPU. Satisfying those obligations may affect the terms of the sale, including the number of qualified buyers, the conditions of sale, and the sale price.

Consistent with that analysis, the Chancery Division order directs the receiver to solicit and notify both the court and the BPU of "proposals for the acquisition of the Company or its assets by a qualified buyer or buyers." The court explained that "[t]he receiver's function is not to obtain the highest possible value for the company, but to arrange a sale that is commercially reasonable in light of the company's current condition." The term "commercially reasonable" is not self-defining. In this context, we assume it implicitly recognizes that the public responsibilities of a utility can affect the value of its assets.

Property affected with a public interest, such as the assets of a public utility, fulfill a societal need while providing an investment opportunity. In general, investors may expect a utility to earn a reasonable rate of return on its assets. *N.J.S.A.* 48:2–21(b); *In re Proposed Increase Intrastate Sand Rates,* 66 *N.J.* 12, 23–24, 327 *A.*2d 427 (1974). That expectation, however, is subject

to the utility's duty to provide safe, adequate, and proper service. *In re Valley Road Sewerage Co., supra,* 285 *N.J.Super.* at 209–11, 666 *A.2d* 992. Hence, the utility's duty to provide such service limits the investment opportunity. Our dissenting colleagues do not recognize that when a utility fails, as miserably as this utility has failed, to meet its public obligations, that failure can affect the value of the utility's assets. Indeed, the dissent substitutes its opinion for the concerns of the utility's customers and the BPU, the agency entrusted with the responsibility of regulating utilities. Contrary to the dissent, we believe that the Legislature did not intend that the BPU should shrink from its delegated responsibilities when confronted with so egregious a case of utility mismanagement.

■ The record establishes that Valley Road will not be on a sound financial footing in the foreseeable future. Decades of mismanagement have undermined the utility's assets and its ability to earn a reasonable return. To postpone the sale would reward Valley Road for its failure to obey environmental requirements, pay taxes, and fulfill its duty to its customers.

The judgment of the Appellate Division is affirmed.

GARIBALDI, J., dissenting.

Today, the majority holds that the Board of Public Utilities (BPU or Board) has the authority to revoke the franchise of Valley Road Sewerage Company (Valley or Company); to divest Valley's sole shareholder and his wife of any interest in their Company; to bar them from owning or managing any public utility in New Jersey; and to seek the appointment of a receiver to sell their Company. It is undisputed that there is no explicit statutory authorization for such acts. Therefore, the issue is whether the BPU exceeded the authority granted in its enabling legislation. I find that it did.

I.

*N.J.S.A.* 48:2–23 provides that every New Jersey public utility is required to:

> furnish safe, adequate and proper service, including furnishing and performance of service in a manner that tends to conserve and preserve the quality of the environment and prevent the pollution of the waters, land and air of this State, ... and to maintain its property and equipment in such condition as to enable it to do so.

That same obligation is set forth in *N.J.S.A.* 48:3–3, which prohibits any utility from "provid[ing] or maintain[ing] any service that is unsafe, improper or inadequate."

I recognize "that the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and that the courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent." *Department of Labor v. Titan Constr. Co.,* 102 *N.J.* 1, 11, 504 *A.*2d 7 (1985) (quoting *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 562, 384 *A.*2d 795 (1978)). I also recognize that the Legislature has endowed the BPU with broad power to regulate public utilities and that the BPU has considerable discretion in exercising those powers. *In re Elizabethtown Water Co.,* 107 *N.J.* 440, 449, 527 *A.*2d 354 (1987); *see In re New Jersey Power & Light Co.,* 9 *N.J.* 498, 508, 89 *A.*2d 26 (1952). Nonetheless, we have repeatedly held, "[a]n administrative agency may not under the guise of interpretation extend a statute to include persons not intended, nor may it give the statute any greater effect than its language allows." *Kingsley v. Hawthorne Fabrics, Inc.,* 41 *N.J.* 521, 528, 197 *A.*2d 673 (1964).

Administrative agencies do not possess unbridled power to adopt rules and regulations they deem necessary to effectuate legislation. Therefore, the issue is not whether the BPU believes because of corporate mismanagement that it is good policy to revoke the franchise of a utility, but whether, in enacting the Department of Public Utilities Act of 1948, *N.J.S.A.* 48:2–1 to –91 (the Act), the Legislature intended and authorized such a drastic remedy. Revoking a franchise, divesting a person from ownership of his or her property, barring a person from ever owning and operating a public utility, and compelling the forced sale of someone's property, are extreme remedies. An examination of

statutory language and prior decisions establishes that the Legislature never intended to give the BPU such power under its enabling legislation. Such a sweeping change of an agency's authority must be made by the Legislature, not by an administrative agency. To hold otherwise circumvents the legislative intent.

## II.

Valley is a small, privately owned sewerage company servicing residential subdivisions in Hillsborough Township in Somerset County and Tewksbury Township in Hunterdon County. Valley operates three treatment plants: the River Road and Fieldhedge Drive plants in Hillsborough, which serve 405 and 142 customers, respectively, and the Tewksbury plant, which serves 76 customers. Valley also operates three pump stations and maintains approximately fourteen miles of collecting lines, most of which are under the streets. At the time the rate petition was filed in 1989, Valley had 537 customers; that number has since grown to 619.

Valley was founded in 1962 by Richard Schindelar who, until his death from leukemia in 1996, was Valley Road's Chairman of the Board of Directors, President, and sole shareholder. His wife, Marjorie, served as a director and as Valley Road's corporate secretary. Mr. Schindelar devoted a substantial part of his adult life and career to Valley and invested the bulk of his life savings in Valley. In April of 1995, as a result of Schindelar's failing health, Valley turned over operation of its treatment plants and pump stations to U.S. Water, Inc., a company specializing in the operation of sewerage treatment facilities on a contract basis. U.S. Water continues to operate the facilities at this time. In May of 1995, a receiver was appointed who assumed supervisory responsibility for Valley's operations.

Since its inception, Valley has had only two rate increases, one in 1979 and one in 1984. On August 21, 1992, Valley filed a petition for interim rate relief and a permanent increase in its rates. Unable to reach a settlement with the BPU, the petition was sent to the Office of Administrative Law as a contested case.

At a public hearing on the rate increase, only eighteen of the 300 Valley customers who attended opposed the rate increase. An attorney who represented the Township of Hillsborough and the Rutgers Environmental Law Clinic also objected.

The Administrative Law Judge (ALJ) denied Valley's request for rate relief. Instead, the ALJ adopted the BPU's recommendation and, although expressly noting that Valley, which has not had a rate increase since 1984, was "obviously in need of funds," denied any rate increase, stating "it would be imprudent for me to attempt to determine a revenue requirement at this time." The ALJ also recommended that the Board direct Valley to show cause pursuant to *N.J.S.A.* 48:2–23 why it "should not be ordered to furnish safe, adequate and proper service as a public utility of the State of New Jersey."

The BPU expanded the ALJ decision by ordering "the initiation of hearings [the "revocation hearing"] into whether the operating authority of Valley ... should be revoked for failure to render safe, adequate and proper service." After the hearings, on November 4, 1994, the BPU ordered the revocation of Valley's franchise and the permanent divestiture and debarment of the Schindelars "from owning, operating, managing, controlling, or having any interest in a New Jersey public utility." Additionally, the order sought the appointment of a receiver to undertake the day-to-day operations of Valley and to sell the Company.

At the BPU's request, the Chancery Division appointed a receiver on May 16, 1995. The court, however, treated the BPU's request as an enforcement proceeding pursuant to *Rule* 4:67–6 and thereby refused to rule on whether the BPU had the authority to revoke Valley's franchise and request a receiver to sell the property. Further, in appointing the receiver, the Chancery Division observed that the receiver would have to request a rate increase to continue Valley's operation. The Appellate Division affirmed the orders of the BPU and the Chancery Division. 295 *N.J.Super.* 278, 284, 685 *A.*2d 11 (1996). We granted Valley's petition for certification. 151 *N.J.* 71, 697 *A.*2d 544 (1997).

## III.

Before turning to a discussion of the law, it is important to understand precisely what the BPU claims was wrong with Mr. Schindelar's management of Valley. The BPU order found that the Valley management was culpable of managerial neglect or dereliction based upon essentially four alleged circumstances: inflow and infiltration of ground water in Valley's system, penalty assessments by the Department of Environmental Protection (DEP), unpaid tax liabilities, and Valley's failure to seek a rate increase for eight years. Upon close scrutiny, however, it is evident that many of those problems have been resolved.

On September 20, 1994, Valley entered into an Agreement to Execute a Closing Agreement with the New Jersey Treasury Department, Division of Taxation, concerning the payment of its gross receipts and franchise tax, excise taxes, and administrative expenses. Article 7 of that Agreement states that although the Agreement will become effective immediately, the executed Closing Agreement will not be provided until the taxpayer provides satisfactory evidence acceptable to the Division that "it has reached full and complete settlement with the BPU." Similarly, Valley entered into an Agreement to Execute a Closing Agreement with the Township of Tewksbury, dated October 13, 1994, concerning settlement of its gross receipts and franchise taxes and real estate taxes due Tewksbury. That Agreement also provides that the Closing Agreement would be contingent until Valley Road reached "a full and complete settlement" with the BPU.

The DEP also entered into Administrative Consent Orders (ACOs), drafted by the DEP, for Valley's Fieldhedge Drive and River Road plants. The ACOs provide for waiver of the bulk of the assessments, substantial reductions in the remaining assessments, and interim (five year) modifications to Valley's discharge permits that will prevent Valley from exceeding the permit parameters, thus making future penalty assessments unlikely. The ACOs also have not been finalized because of the BPU's failure to resolve this matter. The BPU cites Valley's environmental prob-

lems as a major reason for the sale of Valley, and asserts that those problems are more properly within the purview of the DEP. However, the DEP was never a party to this action and no member of the DEP ever testified before the ALJ, the BPU, or the Chancery Division.

The BPU also dismissed Valley's proposed plan to change management as "too little, too late and too costly." The plan basically included new professional management and implementation of the settlement agreements with the DEP and taxing authorities. Those agreements would have reduced Valley's DEP assessments and outstanding tax liabilities and, by spreading payment over an extended period in the future, would have a significant effect on Valley's financial condition. Indeed, the receiver appointed by the Chancery Division is in no better position to address and settle those matters than the new management proposed by Valley would have been.

Because the Board has determined that Mr. Schindelar was not a good manager of Valley, Schindelar's wife and children stand to lose the Company through a forced sale that may result in a devastating loss of much of his hard work and investment. The BPU reached its conclusion despite the fact that the BPU did not find, and there is no suggestion, that Mr. Schindelar ever did anything illegal or unethical; that Valley's ratepayers ever received anything less than uninterrupted, reliable service; and notwithstanding the substantial efforts that Valley has made to comply with the BPU's November 4 order.

I now turn to an examination of statutory language and prior cases to answer the fundamental question: under what circumstances may the BPU, an administrative agency, take the Schindelars' property by revoking Valley's franchise and sell their Company against their wishes in a forced sale.

IV.

I begin with a brief observation about franchises. A franchise is a privilege of a public nature conferred by the government on an

individual or corporation. *South Lakewood Water Co. v. Township of Brick (In re South Lakewood Water Co.)*, 61 *N.J.* 230, 238, 294 *A.*2d 13 (1972); *see also* 36 *Am.Jur.2d Franchise* § 4 (1968). Franchise rights, although for the public benefit, are private property rights subject to the protection of the law. *Public Service Gas Co. v. Board of Pub. Util. Com'rs*, 87 *N.J.L.* 581, 593, 92 *A.* 606 (E. & A.1914). If a franchise is taken for public use, the owner is entitled to just compensation. *Id.* at 595 (citations omitted).

Although a franchisee is entitled to just compensation for a taking, no such compensation is required if the franchise is forfeited for a breach of conditions, or if the granting authority revokes or repeals the franchise under a reserved express power to do so. 36 *Am.Jur.2d, supra*, at § 5. "Forfeitures are not favored." *Id.* at § 54. Courts "will always lean against a forfeiture," unless the "legislature has prescribed certain conditions upon which a corporation shall forfeit its franchises." *Ibid.*

I now consider the statutory language. It is undisputed that there is no explicit statutory language authorizing the revocation of a franchise or the permanent barring of a stockholder or an officer of a utility from ever owning or managing a utility. In *A.A. Mastrangelo, Inc. v. Commissioner of DEP*, this Court acknowledged that the absence of an express statutory authorization in the enabling legislation will not necessarily preclude administrative agency action. 90 *N.J.* 666, 684, 449 *A.*2d 516 (1982).

Equally important, however, is a court's responsibility to restrain agency action "[w]here there exists reasonable doubt as to whether such power is vested in the administrative body." *In re Jamesburg High School Closing*, 83 *N.J.* 540, 549, 416 *A.*2d 896 (1980). Where such doubt exists, and where the enabling legislation cannot fairly be said to authorize the agency action in question, the power is denied. *Id.* See also *Burlington County Evergreen Park Mental Hospital v. Cooper*, 56 *N.J.* 579, 598, 267 *A.*2d 533 (1970); *Swede v. City of Clifton*, 22 *N.J.* 303, 312, 125 *A.*2d 865 (1956).

[*Ibid.*]

The Legislature's authorization to revoke the franchises of small water companies, and the absence of such a provision with respect to small sewerage companies, indicates that the Legislature did

not intend to grant the BPU general authority to revoke a franchise of sewerage companies for corporate mismanagement. *N.J.S.A.* 58:11–59, referred to as the "Small Water Company Takeover Act", provides in pertinent part:

> Whenever any small water company is found, after notice and public hearing, to have failed to comply, within a specified time, with any order of the Department of Environmental Protection concerning the availability of water, the potability of water and the provision of water at adequate volume and pressure, ... the department and the Board of Public Utilities shall, after notice to capable proximate public or private water companies, municipal utilities authorities, ... municipalities or any other suitable governmental entities wherein the small water company provides service, conduct a joint public hearing to determine: the actions that may be taken and the expenditures that may be required, including acquisition costs, to make all improvements necessary to assure the availability of water, the potability of water and the provision thereof at adequate volume and pressure, including, but not necessarily limited to, *the acquisition of the small water company by the most suitable public or private entity.* (emphasis added).

The statutory provisions dealing with sewerage companies, *N.J.S.A.* 48:13–1 to –14, do not provide for the takeover and sale of those companies for failure to provide adequate service. Likewise, the BPU's regulations specifically permit the Board to order the sale of the small water company, but do not provide for such an action with respect to sewerage companies. *See N.J.A.C.* 14:9–6.1 to –6.13. Moreover, the regulations provide procedural protections to the small water company by limiting application of that remedy to situations "concerning actual or imminent public health problems," *N.J.A.C.* 14:9–6.6, and requiring that other "appropriate and available enforcement options" be pursued prior to implementation of the takeover and sale procedures, *N.J.A.C.* 14:9–6.7(a). Those regulations were enacted to implement *N.J.S.A.* 58:11–59. The lack of similar regulations regarding sewerage utilities can only be interpreted to indicate that the BPU has not construed its general enabling legislation as conferring such authority. That conclusion is further supported by the statement at oral argument of the Counsel for the BPU that the BPU has never authorized the revocation of a sewerage company franchise for mismanagement.

Moreover, *N.J.S.A.* 58:11–60 provides that

[c]ompensation for the acquisition of a small water company shall be determined:

a. By agreement between the parties, subject to the approval of the [BPU], in consultation with the [DEP], and after a joint public hearing by the board and the department; or

b. Through use of the power of eminent domain.

In enacting the Small Water Company Takeover Act, the Legislature has shown its concern that drastic actions, such as revocation and forced sale of a franchise, should be undertaken only when there are "actual or imminent public health problems" and, in those situations, the owners should be accorded fair and just compensation for their property. None of those considerations are reflected in the pending takeover and sale of Valley. There are no allegations of actual or imminent public health problems nor is there any provision for the owners to receive fair and just compensation for their property. Accordingly, in view of the specific provisions of *N.J.S.A.* 58:11–60, it is inconceivable that the Legislature intended the revocation and forced sale of a small sewer company like Valley under the BPU's general enabling language.

## V.

An examination of prior law also supports my conclusion that the BPU has no authority to revoke Valley's franchise for poor management, to permanently divest and bar the Schindelars from the public utility business, and to compel the forced sale of Valley. Although the BPU relies on *Township of Deptford v. Woodbury Terrace Sewerage Corp.,* 54 *N.J.* 418, 255 *A.*2d 737 (1969), for the proposition that the Board has the power to revoke a utility's franchise, that case is distinguishable. In *Deptford, supra,* the Court was asked to determine whether the Board had the authority to *modify* a previous order approving the franchise of a public utility. *Id.* at 420, 255 *A.*2d 737 (emphasis added). In upholding the BPU's power to modify its order approving the franchise, the Court simply cited *N.J.S.A.* 48:2–40, which states that the Board " 'at any time may order a rehearing and extend, revoke or modify

an order made by it.' " *Id.* at 425, 255 *A.*2d 737. The *Deptford* Court did not provide any other analysis.

Indeed, *Deptford* is not generally cited for the proposition that the Board has the power to revoke a franchise, but for the simple proposition that the BPU was granted "the widest range of regulatory power over public utilities." *See, e.g., A.A. Mastrangelo, Inc., supra,* 90 *N.J.* at 685, 449 *A.*2d 516; *South Lakewood Water Co., supra,* 61 *N.J.* at 247, 294 *A.*2d 13; *In re Scioscia,* 216 *N.J.Super.* 644, 653, 524 *A.*2d 855 (App.Div.), *certif. denied,* 107 *N.J.* 652, 527 *A.*2d 471 (1987). *Deptford* did not specifically address whether the Board, based solely on its enabling legislation, had the authority to revoke a franchise and bar an individual from participating in any utility in the State.

There are only two reported cases that have upheld the BPU's power to revoke a franchise and bar an individual from participating in a specific utility's business. *See In re Inter County Refuse Serv., Inc.,* 222 *N.J.Super.* 258, 536 *A.*2d 775 (App.Div.), *certif. granted,* 111 *N.J.* 618, 546 *A.*2d 535 (1988), *certif. dismissed,* 114 *N.J.* 485, 555 *A.*2d 609 (1989); *In re Scioscia, supra,* 216 *N.J.Super.* 644, 524 *A.*2d 855. In *Scioscia, supra,* the appellant had been convicted of participating in a complex conspiracy to rig bids on garbage collection contracts, in violation of *N.J.S.A.* 56:9–3. *Id.* at 648–49, 524 *A.*2d 855. As a result of appellant's conviction, the BPU revoked appellant's certificate of public convenience and necessity, and prohibited appellant from participating in the solid waste disposal business. The BPU based its decision on the ALJ's conclusion that appellant's actions, which had resulted in his criminal conviction, also constituted violations of both the Solid Waste Utility Control Act of 1970, *N.J.S.A.* 48:13A–1 to –13, which prohibits monopolization in the solid waste collection and disposal business, and the Board's implementing regulation, *N.J.A.C.* 14:3–10.12. *In re Scioscia, supra,* 216 *N.J.Super.* at 649–50, 524 *A.*2d 855.

Relying on the Solid Waste Utility Control Act, which "extended the general regulatory authority of the BPU over public utilities to

waste collectors, ... and specifically conferred rule making authority upon the BPU with respect to the 'public utility aspects of the solid waste collection industry,' " the *Scioscia* court upheld the BPU's actions. *Id.* at 653, 524 *A.*2d 855. The court also found that the BPU had authority to bar appellant from participating in the waste disposal business. The court based its decision on the "numerous sections [of the Solid Waste Utility Control Act] which confer pervasive power and responsibility upon the BPU to regulate individuals involved in the solid waste business and to determine qualifications for participation in the business." *Id.* at 655, 524 *A.*2d 855 (citing *N.J.S.A.* 48:13A–6 (prohibiting any person from participating in solid waste collection business until found qualified by BPU); *N.J.S.A.* 48:13A–9a (allowing Board to revoke or suspend certificate of public convenience and necessity); and *N.J.S.A.* 48:13A–12a (holding officers, agents, directors, principals, managers, or employees of solid waste collector individually accountable for certain violations)).

The Appellate Division also upheld the BPU's authority to revoke a utility's franchise in *In re Inter County Refuse Service, Inc., supra,* 222 *N.J.Super.* 258, 536 *A.*2d 775, a case factually similar to *In re Scioscia.* Like *Scioscia, supra, Inter County* involved a criminal conviction for conspiracy to restrain trade in the solid waste business. The two cases are also related in that the appellant in *Inter County* was Scioscia's co-conspirator. After the appellant was criminally convicted, the BPU issued an order to show cause why Inter County's certificate of public convenience and necessity should not be revoked and why Inter County's president should not be barred from participating in any solid waste business in New Jersey. 222 *N.J.Super.* at 262, 536 *A.*2d 775. At the hearing before the ALJ, Inter County presented evidence that its president was no longer serving in that capacity because he had sold all of his interest in the utility to a business associate and his wife. *Ibid.* The stock transfer had been conducted without prior approval of the Board. Inter County argued that the ex-president's criminal activity was no longer imputable to the utility and that its certificate should not be revoked. The

ALJ recommended that Inter County's certificate be revoked and that the company's president be barred from participating in the solid waste industry. *Id.* at 263, 536 *A.*2d 775. The BPU adopted the ALJ's recommendations. *Ibid.* On appeal, the Appellate Division found that the stock transfer was not valid because the parties did not obtain Board approval for the transfer. *Id.* at 268, 536 *A.*2d 775. Because the president's criminal conviction was still imputable to the company, the court upheld the revocation of Inter County's certificate of public convenience and necessity. Additionally, the court upheld the order barring Inter County's president from the solid waste business. *Id.* at 271, 536 *A.*2d 775.

Both *Scioscia* and *Inter County* are easily distinguishable from the present case because in those cases the BPU's actions were based on specific provisions of the Solid Waste Utility Control Act, and not in reliance on the BPU's general enabling legislation. The Solid Waste Utility Control Act has several provisions that specifically address the BPU's power to determine the qualifications of persons seeking permission to participate in the solid waste business, *N.J.S.A.* 48:13A–6; to revoke or suspend a solid waste utility's certificate of public convenience and necessity, *N.J.S.A.* 48:13A–9a; and to hold officers, agents, directors, principals, managers, or employees of a solid waste collector individually accountable for certain violations, *N.J.S.A.* 48:13A–12a.

Moreover, unlike the management in *Scioscia* and *Inter County,* whose exclusion from the solid waste industry was based on their own criminal conduct, Valley and its management have not committed any criminal conduct. In both those cases, the revocation was based on a statute and implementing regulation that specifically prohibited conduct in which the barred officers personally engaged. Because both cases were decided on the basis of the Solid Waste Utility Control Act, which conferred more extensive and more explicit powers to the BPU with respect to revocation and barring ownership than does the Board's enabling legislation, *Scioscia* and *Inter County* are not dispositive of the issues in this case.

## VI.

Assuming for purposes of argument that the BPU is authorized to bar ownership in a utility, the severe penalty of not only barring an individual from ever owning a utility but also divesting the individual of his current interest in a utility, are not appropriate remedies for "mismanagement" and certainly should not be imposed without rulemaking.

Counsel for the BPU advised us at oral argument that the agency has never used this power to revoke the franchise of a utility or to divest and bar its officers solely because of mismanagement. Not only is there no specific statutory authorization for such acts, but there are no BPU guidelines or regulations concerning such actions. Such drastic results should be preceded by regulations setting guidelines for their application.

This case is somewhat analogous to *Department of Labor v. Titan Construction Co.*, 102 *N.J.* 1, 504 *A.*2d 7 (1985), which involved the debarment of corporate officers from public contracting work for corporate violations of the New Jersey Prevailing Wage Act. Unlike the Solid Waste Utility Control Act, the Prevailing Wage Act did not specifically indicate that corporate officers were subject to the prohibitions of that legislation and the remedies it provides. Thus, the court noted that "[t]he Act itself provides no standards establishing the grounds for debarring corporate officers." 102 *N.J.* at 17, 504 *A.*2d 7. Moreover, the position of the Department of Labor in *Titan, supra,* was that a corporate officer could be debarred even though he was "entirely without knowledge of or culpability for the corporate violation." *Ibid.* The Court concluded that any attempt to impose vicarious liability upon a nonculpable person presented substantial legal and policy issues that should be addressed through rulemaking before punitive action was taken. *Ibid.* Indeed, the Court held that "[f]undamental principles of due process mandate that standards must be established to define the conduct that will result in individual debarment." *Ibid.* Likewise, before a forced sale and permanent divestiture and debarment is enforced, there should be

guidelines and regulations setting forth the conditions under which such draconian measures are to be undertaken.

Moreover, there should be a rational connection between the misconduct and the remedy imposed. The misfeasance found in this case had to do with the management of Valley and not Schindelar's character or ethical competency to own Valley. Although this purported misfeasance, which the BPU has labeled a failure to provide "safe, adequate and proper service," might support the removal of Schindelar from the management of Valley, there is no authority and no justification for removing Schindelar and now his family as the owners of Valley. The only previous reported cases imposing such harsh sanctions have involved willful misconduct, i.e., criminal actions that adversely reflected on the respondent's ability to own a public utility, and not simply poor management ability.

There are less drastic measures available to the BPU than revocation and permanent debarment. Companies exist that specialize in providing the operation and management of sewerage treatment facilities owned by others. Valley has retained such a company, U.S. Water, Inc., to operate its facilities. Because Mr. Schindelar is dead, there is no reason not to allow the adult members of his family to appoint new management to operate Valley and to give them an opportunity to sell Valley if they wish. The BPU has failed to show that much less drastic remedies would not work.

## VII.

Even assuming Mr. Schindelar's mismanagement, the severe remedies imposed by the BPU exceed the authority granted by its enabling legislation. When the Legislature intends to allow the BPU to revoke a franchise and sell a utility, it does so in unmistakable language. See N.J.S.A. 58:11–59. It did not do so here and, therefore, the BPU has no authority to do it.

I would reverse the judgment of the Appellate Division.

HANDLER and STEIN, JJ., join in this opinion.

*For affirmance*—Chief Justice PORITZ, and Justices POLLOCK, O'HERN and COLEMAN—4.

*For reversal*—Justices HANDLER, GARIBALDI and STEIN—3.