TOWNSHIP OF DEPTFORD, PLAINTIFF-RESPONDENT, v. WOODBURY TERRACE SEWERAGE CORP., DEFEND-ANT-APPELLANT.

Argued May 5, 1969—Decided July 15, 1969.

*Mr. Sidney M. Schreiber* argued the cause for defendant-appellant (*Messrs. Schreiber and Lancaster,* attorneys).

*Mr. Alfred T. Sanderson* argued the cause for plaintiff-respondent.

*Mr. William Gural,* Deputy Attorney General, argued the cause for Board of Public Utility Commissioners, *amicus curiae* (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

PROCTOR, J.   This appeal concerns the power of the Public Utilities Commission (PUC) to modify an order which had previously approved the franchise of a public utility.

On August 8, 1955, plaintiff Township of Deptford granted a franchise to the defendant, Woodbury Terrace Sewerage Corporation (Woodbury), for the construction and operation of a sewage disposal plant and system which would service one part of the Township. Woodbury is a public utility organized under Title 48:13 of the Revised Statutes. The Township ordinance granting the franchise contained the following option provision:

2b * * * "That the Woodbury Terrace Sewerage Corp. by acceptance of this consent makes an irrevocable continuing and unlimited offer to the Township of Deptford to sell, bargain, transfer and assign to the Township of Deptford, or its successors, all mains, meters, plants and pumping station and all and any other physical equipment of its sewerage system and all rights, privileges and franchises in and pertaining to the tract, for which consent is now given, for the sum of EIGHTY THOUSAND DOLLARS ($80,000.00) or a sum equal to the cost of the sewerage plant excluding the cost of mains, whichever sum is less; deducting nevertheless a sum equal to one-

sixteenth (1/16) of the purchase price, as above provided, for each complete year of operation following the date when the said corporation commences operation of any part of the system, and for the sum of ONE DOLLAR ($1.00) at any time after the expiration of sixteen years from the date when the corporation commences operation of any part of the system. It is mutually agreed that upon the adoption by the Township of Deptford of an ordinance accepting the above offer, the Woodbury Terrace Sewerage Corp., shall forthwith without fraud or delay, sell, bargain, transfer and assign the said facilities to the Township of Deptford for the agreed price as herein provided.

"The title to be sold to the Township of Deptford for the price as above shall be free and clear of all charges, debts, liens, mortgages, bonds or other encumbrances or obligations whatsoever of the Woodbury Terrace Sewerage Corp. and the said utility company shall not in any way encumber or allow to be encumbered any of the facilities of the company upon which the Township may exercise its option, provided however, that the Woodbury Terrace Sewerage Corp. may encumber the plant and system in an amount not exceeding at any time that sum for which the Township may purchase the facilities as provided heretofore."

The grant of the franchise was then approved by the PUC on October 13, 1955. In March 1957, after the plant and part of the system had been constructed at a cost of over $90,000, the PUC informed Woodbury that its annual depreciation charge of 6 2/3% upon which it was basing its rate schedule was too high, since the sewage disposal system had an economic life expectancy of 40–50 years. It suggested that Woodbury use a figure approximating the normal life of the system, instead of measuring depreciation against the reduction in the purchase price specified in the option clause quoted above. (Contrary to the intimation in the dissenting opinion, the parties had made no agreement as to the proper rate of depreciation.) On September 13, 1957 Woodbury petitioned the PUC for a ruling which would either permit the higher rate of depreciation or void the option provision. A public hearing was held, but the Township of Deptford, though duly served, did not appear. On March 26, 1958 the PUC ordered depreciation at the rate of 2 1/4% (a 40–year economic life) and amended the October 13, 1955 approval of franchise to include the statement:

"This certificate is not to be construed, under any circumstances, as a ruling upon Paragraph 2b of the Ordinance with respect to the acquisition of the utility properties by the Township of Deptford."

A clause identical to the above appears in the orders approving the franchises of the two other sewer utilities in Deptford Township, Cooper Village and Oak Valley, both of which contained essentially the same option clause in their franchises as in Woodbury's. The thrust of Woodbury's petition was, to a great extent, that it be placed in the same position *vis a vis* the Township as the other sewer utilities, both of whose option clauses, it contended, had been voided in 1956.

After the PUC's action in 1958, Woodbury expended considerable funds in expanding their system, obtaining approval from the PUC in 1960 and in 1961 for the refinancing of a demand note and the sale of stock in order to pay for the additions. From 1957 to 1967 Woodbury doubled the number of customers being served.

In 1966 the present suit for specific performance of the option provision in the franchise, Paragraph 2b, was instituted by the Township. The trial court held that the option provision could not become operative without PUC approval, and that the action of the PUC in 1958 in specifically failing to approve Paragraph 2b had the effect of rendering that provision invalid.

The Appellate Division reversed, holding that the order of the PUC of March 26, 1958 amending the franchise "was not a disapproval of the option but a statement that the PUC neither approved nor disapproved it. Further, assuming the PUC had the power to approve or disapprove the option when it approved the franchise initially, and the right thereafter to amend its approval of the franchise in other respects, we hold that in face of *N. J. S. A.* 48:3–7 the PUC had no authority to void the option after it had approved it, especially after more than two years had elapsed and over 100 houses had been connected to the system." 101 *N. J. Super.*

426, 433–434 (1968). The Appellate Division remanded the case to the trial court for a hearing on Woodbury's remaining defenses. We granted Woodbury's petition for certification. 52 *N. J.* 501 (1968).

On this appeal, we begin by examining the PUC's order of March 26, 1958 amending its approval of Woodbury's franchise. The Legislature has expressly provided that no franchise granted by a municipality "shall be valid until approved by the board." *N. J. S. A.* 48:2–14. The plaintiff argues, as the Appellate Division held, that the PUC's language in its order was not a disapproval of Paragraph 2b, the option clause. While the language of the 1958 order standing alone may appear equivocal, it is clear that when the language is read together with *N. J. S. A.* 48:2–14, a failure to specifically approve a provision constitutes disapproval. This was the only interpretation of the statute which was offered before the PUC's Examiner at the hearing.

■ In any event, we are convinced from a reading of the record that the PUC intended to void the option clause. The PUC has in many decisions refused to approve conditions in franchises using language similar to that used in the present case, with the intent to thereby render them ineffective. See, *e. g., Lynpark Utility Co.,* P.U.C. Dkt. No. 637–480 (Oct. 17, 1963); *Birch Hill Park Disposal Co.,* P.U.C. Dkt. No. 617–529 (Aug. 22, 1961). The fact that the PUC approved the extension of credit and the expansion of facilities subsequent to the 1958 order is a clear indication that it treated its amending certificate as having the effect of voiding the option provision. Otherwise, the PUC would be permitting the borrowing of funds based upon an equity which would, as a result of the option clause, prematurely depreciate to zero in about 10 years.

■ The action taken by the PUC on March 26, 1958 was a disapproval of the option clause. There remains the question whether such a disapproval was within the power of the PUC. With regard to the general powers of the PUC, Justice Hall has said for this Court:

"[T]his State has delegated in most·sweeping terms 'general supervision and regulation of and jurisdiction and control over all public utilities' and 'their property, property rights, equipment, facilities and franchises' to the Board. *N. J. S. A.* 48:2–13. More specifically, the Board is empowered to direct utilities to furnish safe, adequate and proper service, *R. S.* 48:2–23, *N. J. S. A.*, and to that end it may fix just and reasonable standards and practices. *R. S.* 48:2–25, *N. J. S. A.*" *In re Public Service Electric and Gas Co.*, 35 *N. J.* 358, 371 (1961).

Our courts have consistently held that the Legislature in Title 48 intended to delegate the widest range of regulatory power over public utilities to the PUC. *Id.*, at 371; and see, *e. g., Atlantic Coast Electric Ry. Co. v. Public Utility Board*, 92 *N. J. L.* 168 (1918); *In re Central Ry. Co.*, 30 *N. J. Super.* 520 (*App. Div.* 1954).

██ With regard to municipal grants of franchises, the Legislature has expressly provided in *N. J. S. A.* 48:2–14, *supra,* that:

"*No privilege or franchise* granted after May first, one thousand nine hundred and eleven, to any public utility by a political subdivision of this state *shall be valid until approved by the board.* Such approval shall be given when, after hearing, the board determines that the privilege or franchise is necessary and proper for the public convenience and properly conserves the public interests. *In granting its approval the board may impose such conditions as to construction, equipment, maintenance, service or operation as the public convenience and interests may reasonably require. * * *"* (emphasis added).

The language of this statute speaks for itself. While it is no doubt true that Deptford Township had the power to impose conditions upon which the consent to Woodbury's franchise was granted (see *N. J. S. A.* 48:13–3, 6, repealed in 1962), nevertheless these conditions remain inoperative until approved by the PUC. See *Whitehead v. Board of Public Utility Com'rs,* 108 *N. J. L.* 258 (*E. & A.* 1931). It is evident as well that within the PUC's power to pass upon a franchise granted by a municipality is the lesser included power to approve only part of the franchise. *N. J. S. A.* 48:2–14 expressly provides that the PUC may impose con-

ditions as to construction and maintenance as the public convenience may reasonably require. It follows that the PUC, by approving some and not other parts of a franchise, may thereby effectively condition its order. See *In re Greenville Bus Co.*, 17 *N. J.* 131 (1954); *Collingswood Sewerage Co. v. Borough of Collingswood*, 92 *N. J. L.* 509 (*E. & A.* 1918); *Gershkowitz v. Board of Public Utility Com'rs*, 123 *N. J. L.* 606 (*Sup. Ct.* 1940).

The Appellate Division held that assuming the PUC had the power to void the option initially, it lost the power to void the option after it had approved it, "especially after more than two years had elapsed and over 100 houses had been connected to the system." *N. J. S. A.* 48:2–40 provides that the PUC *"at any time* may order a rehearing and extend, revoke or modify an order made by it." (emphasis added). See *N. J. Bell Tel. Co. v. Department of Public Utilities, Board of Public Utility Com'rs*, 12 *N. J.* 568, 578–579 (1953). Moreover, although the Township had due notice and opportunity to present to the PUC evidence of possible injury to it which accrued during that time period, none was presented.

The Appellate Division further held that the PUC lacked authority to void the option "in the face of *N. J. S. A.* 48:3–7." When the franchise was granted in 1955, *N. J. S. A.* 48:3–7 read as follows:

"No public utility shall, without the approval of the board, sell, lease, mortgage or otherwise dispose of or encumber its property, franchises, privileges or rights, or any part thereof; or merge or consolidate its property, franchises, privileges or rights, or any part thereof, with that of any other public utility.

"Every sale, mortgage, lease, disposition, encumbrance, merger or consolidation made in violation of this section shall be void.

"Nothing herein shall prevent the sale, lease or other disposition by any public utility of any of its property in the ordinary course of business, *nor require the approval of the board to any grant, conveyance or release of any lands or interest therein* heretofore made or hereafter to be *made by any public utility to* the United States, State or *any county or municipality* or any agency, authority or subdivision thereof, for public use. * * *" (emphasis added).

■■ This section does not pertain to the option provision in the present case for several reasons. First, it is by no means clear that the term "lands" includes the bulk of the utility's plant, mains and pipes. Indeed, in connection with the acquisition of utility property by municipalities, the Legislature has clearly distinguished between plant and equipment on the one hand, and the "lands" on which they are constructed on the other. *N. J. S. A.* 40:63–23.* In 1962, the Legislature amended *N. J. S. A.* 48:3–7 to read "property" instead of "lands," a further indication that "lands" should be given a narrow interpretation. (*L.* 1962, c. 198, § 36). Second, since the powers delegated by the Legislature to the PUC are to be read broadly, see *In re Public Service Electric & Gas Co., supra,* at 371, conversely, exceptions to those powers must be carefully circumscribed. For this reason we interpret *N. J. S. A.* 48:3–7 to apply to present transfers only, and not to an option which may or may not be exercised at any time in the future. If the option provision were valid, the Township could purchase all of the utility's property at any time for a price well below its true value, in fact after 16 years, $1.00. If this Damoclean sword were permitted to hang over the utility, Woodbury's incentive to adequately maintain and expand its service in the interest of the public would be destroyed, as well as its ability to obtain outside financing. This is espe-

---

* *N. J. S. A.* 40:63–23 provides: "The governing body may purchase, or acquire by condemnation, any sewer or drain, trunk or intercepting sewer or sewers, sanitary or storm sewer or sewers, sewer or drain works, system of sewers or drains, sewer outlets, filtration beds, sewage treatment or disposal works or sewage receptacles, pumping stations, and any and all such improvements as may be required to provide efficient sewerage service for the municipality and its inhabitants, *and also the lands whereon the same are constructed,* and lands necessary or appurtenant thereto, and any rights, privileges or interests therein, or appurtenant thereto, within or without the corporate limits of such municipality, from any individual or corporation owning the same, or, by purchase, from any other municipality, or may contract for the use of the same for a limited time, or otherwise." (emphasis added).

cially true where, as here, the option precludes any encumbrance in excess of the rapidly declining sales price.

We must always remember that we are not here dealing with a contract provision executed between private parties. We are concerned with an agreement between a municipality and a public utility which has a decided impact upon various sections of the public. The expertise of the PUC is required in supervising and regulating this process so as to properly weigh the interests, not only of the present consumers of the utility's services, but also the institutions and individuals who extend credit to the utility so that even greater and more efficient service can be provided the public. We can think of few provisions more stifling to this process, and more detrimental to the consuming public, than the option before us.

Because of the disposition of this case we need not consider the defendant's remaining arguments. We therefore reverse the judgment of the Appellate Division and reinstate the judgment of the trial court.

WEINTRAUB, C. J. (concurring). I join in the opinion of Mr. Justice Proctor but I add that I believe it was beyond the power of the municipality to exact the option in question, and hence that the option was void from the beginning. In my view no statute authorized the imposition of a condition of that kind.

FRANCIS, J. (dissenting). In 1955 the organizers of defendant Woodbury Terrace Sewerage Corp. were developing a large tract of vacant land (for the construction of approximately 250 one-family homes) in the Township of Deptford. The organizers were not sewer utility operators; they were land developers and builders. It is obvious from the record that at the inception of their building project they had no intention of establishing and operating a sewer system. Apparently they expected to receive water and sewerage service from the Town of Westville, the boundary

of which adjoins their development. Westville disappointed them and they had to look elsewhere. Deptford had no sewerage facilities other than individual septic tanks. As a consequence the developers decided to build their own sewer system and plant to service their building project. They then organized defendant-corporation and sought the Township's consent to a sewer utility franchise which they intended to present to the Public Utilities Commission for approval.

Both municipal consent and PUC approval were regulated by statute. With respect to the consent of Deptford, the then controlling statute said:

"The corporate authorities of the municipality may, by ordinance, provide that such consent shall be conditioned upon the payment to the municipality of a specified sum of money, or upon quarterly, semi-annual or annual payment to the municipality of specified sums of money or a specified percentage of the gross receipts of the company. *The corporate authorities shall annex to the consent any other terms and conditions upon which such consent is granted.*" R. S. 48:13–6 (since repealed, L. 1962, c. 198, § 198, p. 1029). (Emphasis added.)

It is of interest to note that at the time defendant was incorporated and requested the consent of the Township to operate a franchise, the sewerage companies' act required the municipal consent containing the terms and conditions thereof to be filed in the office of the secretary of state with the certificate of incorporation. *N. J. S. A.* 48:13–3 (since repealed, L. 1962, c. 198, § 198, p. 1029). It provided also that the filing "shall be conclusive evidence that the company has assented to such terms and conditions [set out in the consent], and the same shall be binding upon the company, its successors and assigns." *N. J. S. A.* 48:13–4. This section remained in force until July 13, 1967, 12 years after the consent was granted by Deptford and the franchise approved by the PUC. *L.* 1967, c. 156, § 3, p. 671.

Defendant negotiated with Deptford for the necessary consent. Both parties were fully competent to bargain and

both were represented by counsel. The negotiations resulted in the agreement set out in the majority opinion (slip opinion, *p.* 2) which was then incorporated into the ordinance expressing the consent and purporting to grant the franchise. By the agreement the Township was given a continuing option to purchase the plant for $80,000, or a sum equal to the cost of the plant excluding the cost of the mains, whichever sum was less. (The cost of the mains was to be included by the developer in the sale price of the houses. Therefore their cost was not to be considered investment expense for the sewer utility.) It was agreed by the parties, obviously in good faith and in the belief the PUC would approve, that the $80,000 (or the possible lesser sum mentioned above), which had been stipulated as the investment cost of the plant, would be recaptured by Woodbury on the basis of a depreciation rate of 6 2/3%. per year. If approved it would mean, earnings permitting, that the investment cost would be recovered in 16 years and that at any time thereafter Deptford could exercise its option to take over ownership of the plant for the nominal consideration of one dollar. It was stipulated also that Deptford could exercise its option to buy at any time during the 16-year period for the $80,000 (or an amount representing cost of plant excluding mains), less whatever amount had been recovered pursuant to the 6 2/3% depreciation rate.

The majority criticizes this contract — but the parties made it. As I have said, the developers were not utility operators; they were primarily interested in their homes-construction project. The sewer utility was a means to an end and it is a fair inference from the limited record that, being builders, all they were interested in was providing the sewer service for the proposed 250 homes. If they could recover their original investment in the plant upon completion and sale of the homes, they would be well satisfied to turn the system over to the municipality for its operation thereafter. In the meantime, and until Deptford exercised

its option, the builders-organizers expected to enjoy a reasonable rate of return on the sewer service.

Woodbury was satisfied with its bargain. It applied to the PUC for approval thereof and its own counsel presented the agreement at a hearing held for that purpose. Counsel for Woodbury was an expert in the utility regulation field — a former PUC commissioner. In offering the certificate of incorporation and the municipal consent in evidence, he said, undoubtedly referring to *N. J. S. A.* 48:13–4, *supra*:

> "I might add, that pursuant to the statute relating to sewer companies, the filing of the Certificate of Incorporation, with the municipal consent attached thereto, which is required, is deemed to be conclusive evidence of the acceptance of the terms and conditions of the consent granted by the municipality."

Everyone, including the PUC, agrees that the municipal consent with its terms and conditions was approved and the certificate issued. If the PUC had given any indication that the consent of any part of it might be rejected, Deptford could have asked for time to engage in further bargaining, or it could have withdrawn its consent pending further bargaining. But Woodbury's application for approval of "the written consent of Deptford Township" was granted by the PUC, and the parties naturally believed the terms and conditions of the municipal consent had been thoroughly sanctified. In fact in announcing its approval of the PUC said:

> "The Board hereby determines that approval of the franchise set forth in the Report and Recommendations is necessary and proper for the public convenience and *properly conserves the public interest.* * * *"

The record indicates plainly that the parties would have lived with the terms of the franchise if problems had not arisen out of Woodbury's understandable effort to apply the plant depreciation rate agreed to therein. On filing the first annual operating report for the year 1955, Woodbury

apparently claimed the right to use the 6 2/3% rate, based upon the 16-year service life. On March 25, 1957, the PUC advised the company that since the plant's service life was 40 years, the proper rate of depreciation was 2 1/4% annually. In its notification the Board wrote:

"If it is your desire to amortize by charges to the Surplus Account, the investment in plant not recovered by normal depreciation over the period *covered by the mandatory offer for sale included in the franchise or municipal consent, there appears to be no objection to such procedure.*" (Emphasis added.)

The emphasis is added to call attention to the fact that at this late date in 1957 the PUC was standing by its approval of the option to sell to Deptford and the terms set forth therein.

At this time approximately 112 houses had been built and were being sewered by Woodbury. Unfortunately, however, operating revenue appears to have been insufficient to permit the difference between the 2 1/4% and 6 2/3% depreciation rate to be charged against surplus. Apparently there was no surplus. It is clear that if Woodbury could not have approval of the 6 2/3% rate chargeable to operating expenses as well as permission to charge sufficient rates for its sewer service to provide a reasonable return on its investment, the sale price could not be recaptured in 16 years. It seems fair to say that neither Woodbury nor the Township contemplated the PUC rejection of the depreciation aspect of their agreement.

In September 1957 Woodbury filed a petition with the PUC alleging that it was entitled to receive through customer service charges the annual 6 2/3% depreciation rate agreed upon between it and Deptford and approved by the Board in 1955. If such rate could not be allowed, then it requested that the 1955 order be amended by revoking the approval of the portion thereof relating to the agreement to sell its plant to the Township. The petition pointed out that similar option clauses appeared in the franchises of

two other sewer utility companies operating in Deptford. These franchises were granted later than the one to Woodbury, and in approving them the PUC had included a clause saying that the certificate of approval was not to be construed as a ruling upon the portion of the ordinance respecting the acquisition of the utility properties involved. After referring to the other cases, Woodbury asked that its franchise be treated in the same fashion, which was that the PUC had expressly refrained from passing on the option provision.

A hearing was held on the petition. The Township did not appear although it had notice. At this hearing Woodbury's experienced counsel asked the Board to amend the 1955 certificate approving the terms and conditions of the municipal consent

"to the extent of revoking or at least not ruling upon the provisions [of the option to sell the plant to Deptford] or at least not ruling upon [that part of the ordinance] and it will then have the quality of these other two sewerage company Certificates * * * and that will result in our establishing * * * the setting up of the accounting for a depreciation item rather than a much higher and greater amortization item."

In March 1958 the PUC executed an order amending the 1955 "Approval of Franchise" to include the following statement:

"This Certificate *is not to be construed, under any circumstances, as a ruling upon Paragraph 2b of the Ordinance* with respect to the acquisition of the utility properties of the Township of Deptford." (Emphasis added.)

In the same order it fixed the allowable depreciation rate at 2 $\frac{1}{4}$% per year.

The majority opinion accepts Woodbury's contention that the amending order invalidated the PUC's original approval of the terms and conditions of the option to sell. Therefore, the opinion holds that the Township cannot obtain specific performance of the agreement to sell. If the amending order

was intended to invalidate the original approval and the option to sell, why did the PUC not say so? Surely there is no language difficulty there. The Attorney General, in speaking of the language used, says in his brief:

"Coming to grips with the manner in which the Board expressed its *disapproval* of the option provision in this case, *it must be admitted that the Board was less articulate than it could have been.* However it is clear that the Board withdrew *its approval* of Paragraph 2b."

The comment is a masterful example of the art of understatement. And the comment prompts the further inquiry as to whether the Board *"expressed its disapproval"* or *"withdrew its approval,"* and said that it was not "ruling" upon the option, thus leaving the parties to ordinary contract remedies in the courts. Judge Gaulkin, writing for the Appellate Division, held that the amending order "was not a disapproval of the option but a statement that the PUC neither approved nor disapproved it." To me, that is clearly the only sensible construction of the Board's language.

In my view it was not necessary for the PUC originally to pass upon the agreement of sale portion of the franchise. Consummation of the sale was intended for the future, and so could have been left for action by the parties at. the appropriate time. It may be concluded reasonably from the statement in the amending order that the Board realized its *approval* of an agreement by a utility to sell its plant to a *municipality* was not required under *N. J. S. A.* 48 :3–7, (quoted in the majority opinion). For that reason its revising order simply said the original approval was not to be *construed as a ruling* upon the portion of the municipal consent containing the agreement to sell.

The Township agrees with the Appellate Division view of the effect of the PUC amending order, that is, it says the order left the parties without either approval or disapproval of the sale option. (With the option in that status, appar-

ently Deptford felt there was no need to appeal from the amending order.) Consequently it felt free to institute this action in the Chancery Division to obtain specific performance of the option. I believe its right to do so should be sustained, and that the Appellate Division judgment on that subject should be affirmed. However, some procedural and remedial aspects of the action require discussion.

The remedy of specific performance is not an absolute one. It is in large measure discretionary resting on equitable principles to be applied upon a consideration of all the circumstances of the particular case. A judgment granting specific performance need not be unqualified in form. In the exercise of sound judicial discretion it may be granted upon such terms and conditions as justice requires, even to the extent that the performance ordered is not identical with that promised in the agreement. *Willard v. Tayloe*, 8 *Wall* 557, 75 *U. S.* 557, 565–570, 19 *L. Ed.* 501 (1870); *Stehr v. Sawyer*, 40 *N. J.* 352 (1963); *King v. Ruckman*, 24 *N. J. Eq.* 556, 562–565 (*E. & A.* 1873); *Flicker v. Chenitz*, 55 *N. J. Super.* 273, 292–293 (*App. Div.* 1959); *Restatement of Contracts* § 359 comments *b, c,* and illustration 1 at 638–640 (1932); 5A *Corbin on Contracts* § 1137, *p.* 97 (1964). With these principles in mind, the affirmance of the Appellate Division should be accompanied by a remand to the trial court subject to consideration there of certain matters hereafter enumerated.

(1) Defendant claimed on oral argument before us that the terms and conditions it agreed to in order to obtain municipal consent for its franchise were not negotiated at arms length; they were imposed on it by Deptford. In effect the contention is that the agreement resulted from economic duress or business compulsion practiced by the municipality and therefore it should be unenforceable in equity. Such a defense (which if sustained would end the case) is not set forth specifically in the pleadings, but defendants answer does allege generally that enforcement of the agreement to sell the plant would be harsh, unjust, oppressive

and inequitable. Considering the nature of the specific performance remedy, I think the defendant ought to be allowed to present on a retrial the full facts on the issues of economic duress and business compulsion and obtain a ruling thereon. See *S. P. Dunham & Co. v. Kudra*, 44 *N. J. Super.* 565 (*App. Div.* 1957). The record now before us is not sufficient to permit adequate consideration of such issues.

(2) As has been indicated above, I believe the parties honestly thought and intended that Woodbury would be allowed by the PUC to recapture 6 2/3% of $80,000 each year of operation as a depreciation rate until the full sum was recovered. It turned out they were *both* mistaken about it and the rate of depreciation was reduced to 2 ¼%, which reduction meant that recapture would require 40 years instead of 16 years. Basically the mutual intention was that the sale price would be reduced only by such sums as in fact had been recovered by the time Deptford exercised the option to buy the plant. Therefore, in computing the actual price for purposes of specific performance equity should grant Deptford credit against the $80,000 (or the alternative price) only for such amounts as Woodbury actually recovered by way of depreciation.

(3) The record shows that in the early 1960's certain additions were made to the original plant with the PUC approval, after hearing on notice and nonappearance by Deptford. The language of the terms and conditions of the contract of sale, in my view, are ambiguous as to whether the $80,000 price was to include the cost of new or additional plant which might be necessary thereafter in order to serve increased needs of the public. This aspect of the option ought to be construed in equity most strictly against the municipality. Accordingly, I would condition a judgment of specific performance on Deptford's willingness to add to the purchase price the sum fixed by the court as the fair value of all additions or extensions to the plant which became part thereof after completion of the original plant.

For the reasons stated the judgment of the Appellate Division should be affirmed and the cause remanded for plenary retrial.

Justice HANEMAN joins in this dissent.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL and SCHETTINO — 5.

*For affirmance* — Justices FRANCIS and HANEMAN — 2.