**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0608-23

IN THE MATTER OF LACEY
SAND SOLAR FARM, LLC –
PETITION FOR ASSIGNMENT
OF "PREFERRED" TREC
FACTOR FOR FLOATING
PHOTOVOLTAIC SOLAR
PURSUANT TO THE BOARD'S
TRANSITION INCENTIVE
ORDER.

_____

Argued February 24, 2025 – Decided March 14, 2025

Before Judges Sabatino, Berdote Byrne, and Jacobs.

On appeal from the New Jersey Board of Public Utilities, Docket No. QO21020469.

Kenneth J. Sheehan argued the cause for appellant Lacey Sand Solar Farm, LLC (Genova Burns LLC, attorneys; Kenneth J. Sheehan, of counsel and on the briefs).

Steven A. Chaplar, Deputy Attorney General, argued the case for respondent New Jersey Board of Public Utilities (Matthew J. Platkin, Attorney General, attorney; Donna Arons and Sookie Bae-Park, Assistant Attorneys General, of counsel; Steven A. Chaplar, on the briefs).

PER CURIAM

In this complex regulatory case, Lacey Sand Solar Farm, LLC ("Lacey") appeals a September 27, 2023 final agency decision of the Board of Public Utilities ("BPU" or "the Board"), which rejected Lacey's petition to have its planned floating solar energy project approved for a Transition Incentive ("TI") program launched by the BPU in 2019. The BPU rejected the petition largely because the floating project would be a so-called "grid supply" facility that would generate power to be sold in the energy market, rather than a "net-metered" facility generating power that would be used on site.

Fundamentally, Lacey argues the agency's rejection of its petition was arbitrary, capricious, and unreasonable. Applying established standards of review in this administrative law appeal, we affirm.

I.

The record in this regulatory matter is well known to the parties and need not be detailed comprehensively. By necessity, we use technical terminology in the paragraphs that follow, mindful those terms will be unfamiliar to most readers not involved in this case.

2

New Jersey's Solar Energy Statutory and Regulatory Framework

On May 23, 2018, the State adopted the Clean Energy Act ("CEA") of 2018, L. 2018, c. 17 (codified at N.J.S.A. 48:3-51 to -87), which increased the renewable energy portfolio standards and obligations for all New Jersey energy suppliers and providers. To achieve that end, the CEA mandated that the BPU adopt rules and regulations aimed at closing what was then the legacy Solar Renewable Energy Certificate Program ("SRP") and cease to accept Solar Renewable Energy Certificates ("SREC") once the Board determined that 5.1 percent of the kilowatt-hours sold in the State by third-party suppliers and basic generation service providers has been generated by solar electric power generators connected to the distribution system ("5.1% Milestone"). See N.J.S.A. 48:3-87(d)(3).

The legislative mandate of 2018 entailed two phases. Phase one was the introduction of a transitional solar energy program, the 2019 New Jersey TI Program, N.J.A.C. 14:8-10.1 to -10.7. Phase two was the initiation of the ultimate successor solar energy program, the 2021 Successor Solar Incentive Program ("SuSI"), N.J.A.C. 14:8-11-1 to -12.8.

"Grid Supply" Versus "Net-Metering" Solar Facilities

The distinction between "grid supply" and "net-metered" solar facilities is important to an understanding of these programs. "Grid supply" solar facilities are large-scale facilities, such as a solar farm, that generate electricity to feed directly into an electrical grid for wholesale distribution.[1] A "grid supply solar facility" is defined in the statute as follows:

> [A] solar electric power generation facility that sells electricity at wholesale and is connected to the State's electric distribution or transmission systems. "Grid supply solar facility" does not include: (1) a net metered solar facility; (2) an on-site generation facility; (3) a facility participating in net metering aggregation pursuant to section 38 of P.L.1999, c.23 (C.48:3-87); (4) a facility participating in remote net metering; or (5) a community solar facility.
>
> [N.J.S.A. 48:3-51.]

In contrast, residential and non-residential "net-metered" facilities are smaller in scale. They usually power a specific building or location on-site.[2] In a net-metered system, when the solar energy system produces more power than

---

[1]  See Clean Energy Technologies: Solar, Dep't of Envtl. Prot., https://dep.nj.gov/cleanenergy/technologies/solar (last visited Mar. 6, 2025).

[2] See Clean Energy Technologies: Solar, supra note 1 (last visited Mar. 6, 2025).

the building or location consumes, the excess power is sent back to the local grid and the facility owner receives a credit.[3]

<u>The Board's December 6, 2019 Order Launching the TI Program</u>

The Board launched the TI program on December 6, 2019. It was designed as an interim program to bridge the legacy SRP program with its successor program, SuSI (then under development). <u>In re New Jersey Solar Transition Pursuant to P. L. 2018, C.17</u>, No. QO19010068, (Bd. of Pub. Utils. Dec. 6, 2019) (the "<u>TI Order</u>"). This is the program applicable on appeal here.

If eligible to participate in the TI program, developers would then receive fixed solar energy incentives. <u>See</u> N.J.A.C. 14:8-10.4(f). Under the TI program, these incentives were structured through issuing factorized Transition Renewable Energy Certificates ("TRECs") (replacing the former SRECs), allowing differentiated and predictable financial incentives for different types of project installments. N.J.A.C. 14:8-10.6(b).

The TI program was opened to: (i) legacy SRP pipeline "subsection (t)" grid supply solar projects that submitted a complete program registration but did not become operational before the BPU determined that the State had attained

---

[3] <u>Ibid.</u>

the 5.1% Milestone, N.J.A.C. 14:8-10.49(a);[4] (ii) legacy SRP pipeline "subsection (r)" grid supply projects that received conditional certification from the Board but did not become operational before the BPU determined that the State had attained the 5.1% Milestone, N.J.A.C. 14:8-10.49(a);[5] and (iii) other net-metered projects as illustrated through the market segments listed in N.J.A.C. 14:8-10.5 (which at its inception did not indicate floating solar as a market). Floating solar was later included as a TI eligible market meriting "distinct treatment" in what is known as the "TREC" program in 2020 and assigned the default TREC factor of 0.6.

Simply stated, the TREC factor designates the rate at which a solar facility will be paid for the energy it generates. The higher the TREC factor, the more the facility can be paid.

---

[4] Subsection (t) projects are grid supply solar projects. N.J.A.C. 14:8-10.2. In re Implementation of L. 2012, Nos. A-2871-22, A-3945-22, A-3947-22 (App. Div. Nov. 4, 2024) (slip op. at 5). Subsection (t) applicants petitioning under the TI program were required to follow "N.J.S.A. 48:3-87(t), the Solar Act of 2012, and the Board's [i]mplementing [o]rders," N.J.A.C. 14:8-10.4(i). We cite our unpublished opinions concerning the program purely for background purposes. R. 1:36-3.

[5] Subsection (r) projects are "grid supply solar installations not addressed by Subsection (q)," N.J.A.C. 14:8-10.2, which essentially covers grid supply rooftop installations and ground mount installations, N.J.A.C. 14:8-10.2(b)(1).

A-0608-23

The TI program remained open to all new registrants (even after the 5.1% Milestone had been reached and as long as the applicant remained compliant) until the successor program was established and open for registration. In re New Jersey Solar Transition Pursuant to P. L. 2018, C.17, No. QO19010068 (Bd. of Pub. Utils. Jan. 8, 2020) ("TI Order II").

TI program registrants seeking certification for the TREC eligibility requirements faced three possible outcomes: "a: full certification, conditional certification, or denial of certification." In re Implementation of L. 2012, Nos. A-2871-22, A-3945-22, A-3947-22 (App. Div. Nov. 4, 2024) (slip op. at 7) (citing N.J.A.C. 14:8-2.4(r), -10.4(j)).

According to the regulations, net-metered solar facilities must be constructed and operational within one year after the applicant received conditional registration for the BPU to issue a New Jersey State Certification Number. N.J.A.C. 14:8-10.4(f)(4)(ii). By comparison, grid supply subsection (t) projects were required to commence commercial operations within two years. Ibid. However, grid supply subsection (t) applicants were also permitted to seek up to two six-month extensions to their existing deadline, making the total possible completion date timeline three years. In re New Jersey Solar Transition

Pursuant to P. L. 2018, C.17, No. QO19010068 (Bd. of Pub. Utils. Aug. 17, 2022).

Waiver Procedures

Pursuant to N.J.A.C. 14:1-1.2, when projects do not fully comply with the procedural regulations, developers may seek a waiver from such rules for "good cause shown" so long as the developer can demonstrate that the project advances the public interest. In re Pub. Serv. Elec. & Gas Company's Rate Unbundling, Stranded Costs & Restructuring Filings, 330 N.J. Super. 65, 132 (App. Div. 2000). The procedure for such a waiver is detailed in N.J.A.C. 14:1-1.2(b):

> In special cases and for good cause shown, the Board may, unless otherwise specifically stated, relax or permit deviations from this chapter.
>
> 1. The Board shall, in accordance with the general purposes and intent of its rules, waive section(s) of its rules if full compliance with the rule(s) would adversely affect the ratepayers of a utility or other regulated entity, the ability of said utility or other regulated entity to continue to render safe, adequate and proper service, or the interests of the general public;
>
> 2. Any person or entity seeking waiver of any of the Board's rules or parts thereof shall apply, in writing, or electronically, through email, to the Secretary of the Board. A request for waiver shall include the following:

A-0608-23

i. The specific rule(s) or part(s) thereof for which waiver is requested;

ii. The reasons for the request of waiver, including a full statement setting forth the type and degree of hardship or inconvenience that would result if full compliance with the rule(s) would be required; and

iii. Documentation to support the request for waiver.

New and Innovative Solar Technologies

As noted above, the TI Order the BPU issued in December 2019 did not set forth a TREC factor for new solar technologies, such as "floating solar," but stated that "new or innovative solar technologies <u>can file</u> a petition with the Board <u>requesting</u> that they be assigned a TREC factorization level." <u>TI Order II</u> (emphasis added). The Board later addressed this omission and set the TREC factor for floating solar at the default 0.6 factor, despite a petitioner's request for a 1.0 factor. See <u>In re Petition of New Jersey-American Water Company</u>, No. QO20020111 (Bd. of Pub. Utils. July 15, 2020). In doing so, the Board elaborated its findings about floating solar technology, cautioning that

> <u>there is relatively little experience with this novel technology, and that much of the existing data is from overseas, or lacks robust cost and revenue data</u>. New Jersey itself has only two operational floating solar facilities. . . Unlike projects located on properly closed

9

A-0608-23

sanitary landfill facilities, brownfields, and areas of historic fill, <u>there is no statutory basis for giving preference to floating solar</u>, such as the Legislature created at N.J.S.A. 48:3-87(t) [(subsection (t) projects)]."

[<u>Ibid.</u> (emphasis added).]

At that time, the Board further evaluated evidence purportedly supporting the positive environmental impacts of a floating solar project, finding those impacts to be "indeterminate":

> Additionally, the assertion that floating solar projects, as a class, are inherently environmentally beneficial also lacks sufficient support in the record. As recognized by DEP's assignment of floating solar to the "Indeterminate" permit categorization, by its nature, each floating solar installation is unique; each is likely to raise different compliance questions and require different NJDEP permits and have different environmental impacts. Placing such large manmade structures on bodies of water, even artificial bodies of water, may raise issues regarding possible negative impacts on wetlands, erosion, water temperature, and endangered species. In addition, the possibility exists of conflicts in usage, flood hazards, navigable waters, and perhaps other unintended consequences.

[<u>Ibid.</u>]

Nevertheless, the Board did state that "floating solar represents <u>a potentially positive</u> development in renewable energy technology and that it is consistent with the Board's longstanding support of renewable energy

innovation to provide floating solar projects additional financial certainty by making such projects eligible for TRECs." Ibid. (emphasis added).  The TREC factor was set to the default 0.6 multiplier, the Board finding that "the floating solar will be at least as expensive as a comparable ground mount project, and a similar 0.6 factor may be appropriate for floating solar projects."  Ibid.

The April 30, 2020 Closure of SRP Registrations

The Board determined that the target level 5.1% Milestone would be reached by April 30, 2020.  Consequently, on April 6, 2020, the Board ordered the closure of SRP registration to new applicants after that date.  See In re New Jersey Solar Transition Pursuant to P. L. 2018, C.17, No. QO19010068 (Bd. of Pub. Utils. Apr. 6, 2020).  The interim TI program, as described above, then came into effect.

Subsequent Closure of the TI program on July 28, 2021

On July 28, 2021, the Board announced the closure of the TI program effective thirty days later.  In re New Jersey Solar Transition Pursuant to P. L. 2018, C.17, No. QO19010068 (Bd. of Pub. Utils. July 28, 2021).  Accordingly, the TI program was closed to registrants on August 27, 2021, and on August 28, 2021, Susi became operational (phase two).  Ibid.

The Proposed Project

Lacey Natural Sand LLC ("Lacey Natural Sand") operates a sand mine in Lacey Township.  At the relevant time, appellant Lacey entered into a ground lease agreement with Lacey Natural Sand, hoping to develop a grid supply floating solar project on the five dredge ponds on its site.  The ponds had formed after the mining of the sand pits.

Lacey's Petition

The BPU order reflects that on February 16, 2021, Lacey timely filed a petition with the BPU pursuant to the Board's 2019 TI program, N.J.A.C. 14:8-10.1 to -10.7.  Lacey's petition specifically proposed a 22.5-megawatt grid supply floating solar project.  It also requested a "preferred" TREC factor of 1.0 in recognition of the higher construction costs associated with floating solar projects.

The parties agree that Lacey's solar project intended to connect five residual dredge ponds created after sand mining to form a single larger pond consisting of 81.5 acres.  Construction of the larger pond would develop as the property is mined over time.

In its brief, Lacey describes "floating solar" technology as follows:

> Floating solar is exactly what it sounds like.  Rather than being mounted on the ground or to a rooftop, solar

photovoltaic panels are mounted to a structure that floats on water, in this case the dredge pond left over from sand mining. Benefits include not using prime land for the development of solar, as well as minimizing water evaporating, restricting algae blooms, and providing a use for otherwise "useless" or underused property. Additionally, water cools the panels, making them, on average, more efficient.

Lacey contends its planned use of these otherwise-abandoned water bodies would prevent them from becoming an attractive nuisance, and that the project would be both revenue-generating and advance the land-use priorities of the Pinelands Comprehensive Management Plan ("CMP").[6]

In support of Lacey's request for an increased TREC factor of 1.0 from the default 0.6 factor, Lacey attached to its petition a report, known as the Gabel Report, which detailed its anticipated project expenses.[7] Lacey describes this report as "setting forth the costs and benefits of the project, showing the costs

---

[6] The record does not expound upon the CMP program and its purpose. The court notes, however, the New Jersey Pinelands Commission protects the Pinelands through the CMP, including implementing regulations and standards for Pinelands land-use and development while "safeguarding the region's unique natural, ecological, agricultural, archaeological, historical, scenic, cultural and recreational resources." See The Comprehensive Management Plan, NJ Pinelands Comm'n, https://www.nj.gov/pinelands/cmp (last visited Mar. 6, 2025).

[7] The Gabel Report was not supplied in the appellate record.

as being in excess of those for installation of non-residential ground mount solar, as well as describing the design and modeling." The Gabel Report supported an even more enhanced TREC factor of 1.1, although Lacey's petition asked for a slightly less generous factor of 1.0.

In addition, Lacey's petition included a letter from the Pinelands Commission stating the solar project was consistent with the land-use priorities of the CMP, although the Board noted that it had not received a copy of a CMP development application.

The Discovery Questions

Responding to Lacey's petition, the Board served three sets of discovery questions (twenty-nine in total) to evaluate the petition and its compliance with the TI regulatory scheme. The first discovery request was in April 2021, and the final discovery response was submitted in February 2022. The Board describes those discovery requests as follows:

> [The BPU's] Staff sought information relating to the project's permitting and electric grid interconnection process, project design, site preparation, and costs. In seeking clarification of Lacey's interconnection process, Staff inquired as to whether an interconnection application had been filed with the regional electric grid

operator PJM,[8] what type of interconnection equipment will be utilized, and the costs of interconnection.

The Board was dissatisfied with Lacey's responses. In particular, the BPU noted, among other things, concerns about the feasibility of the project being completed on time:

> Despite the extensive responses and attachments provided by Lacey, Lacey could not provide a date as to when its project would have approval to connect to the grid or provide clarity as to the excavation times of the mining operations in order to commence construction of the solar array in the time permitted in the TI program.

The BPU's September 27, 2023 Final Agency Decision

On September 27, 2023, the Board issued a decision and order denying Lacey's petition for the floating solar project. The denial principally was because Lacey proposed an ineligible "grid supply" project, and the TI program was only designed to work for "net-metered" projects, outside of those pipeline grid supplied projects that were already conditionally certified "subsection (t)"

---

[8] PJM is a regional transmission organization that coordinates the movement of wholesale electricity in thirteen states and the District of Columbia. Who is PJM?, PJM Learning Ctr., https://learn.pjm.com/who-is-pjm (last visited Mar. 6, 2025).

projects under the legacy Solar Renewable Energy Program, N.J.S.A 48:3-87(t).[9]

The Board's decision concerning Lacey's TI project ineligibility was made in reliance on "Staff Recommendations," which included, among other things, the following statements and reasons:

- The BPU had previously announced that "'new or innovative solar technologies can file a petition with the Board requesting that they be assigned a TREC factorization level', but it did not state that eligibility in the TI Program may be changed for such new or innovative solar technologies."

- "No other general grid-supply projects were accepted into the TI Program, and all such projects have waited for the establishment of the [Competitive Solar Incentive ("CSI")] Program within the SuSI Program."

- Pursuant to N.J.S.A. 14:8-10.4(f)(4)(ii), "[s]taff does not recommend waiving the rules in this closed program and making an exception for the project" because:

    i. Staff noted that Lacey could not provide certainty as to when its project would become commercially operational, which is problematic because grid supply projects with conditional registration in the TI program expire after two years.

    ii. "[Lacey] indicated that the project is to be built on dredge ponds as mining operations proceed and that the ponds are not yet combined. Mining operations of this scale tend to take

---

[9] "Subsection (t)" were grid supply projects constructed on a brownfield, an area of historic fill, or a properly closed sanitary landfill facility. N.J.S.A. 48:3-87(t).

considerable time, and it is unclear that both excavations of the mine and construction of the solar array can be completed in the time permitted in the TI Program. Nothing provided by [Lacey] indicates that this work has yet begun.

iii. "[T]here is ongoing litigation between [Lacey] and Lacey Natural Sand regarding compliance with various terms of the lease. The allegations in that case suggest that [Lacey] does not currently have control over the site or a finalized plan for project configuration. Nor did [Lacey] have site control or a finalized plan for project configuration when they filed their petition in February 2021, making the project inherently speculative."

[(Emphasis added).]

At the same time, the Board denied Lacey's request for a preferred TREC factor of 1.0. The Board concluded that, given the "project's proposed costs and revenues, as well as further experience with this technology in New Jersey and the United States," Lacey failed to adequately demonstrate the appropriateness of the increase in TREC factor. The BPU's staff expressed the following concerns:

> Staff indicates the factors for the TI Program were determined based on an in-depth analysis for each technology class reflecting contemporaneous project costs and benefits, as more fully described in the Transition Order. At that time there was insufficient data to set a class-wide incentive level for floating solar projects. Most experience with this technology is in Europe and Asia, with only a few large-scale projects in the United States to date.

Along with Staff's draft Capstone Report for the Board's ADI Program, developed in consultation with Cadmus Group, LLC ("Cadmus"), Staff also released underlying modeling spreadsheets that employed [System Advisory Model ("SAM")] modeling. One use of SAM is to determine a solar project's anticipated internal rate of return ("IRR") or, alternatively, an incentive level required to provide a given IRR. Cadmus performed an analysis of floating solar costs as compared to ground-mount. It modeled a capital expenditure of $2.17/W for a representative floating solar system, which was 19% greater than the representative ground-mount system. The higher costs derived from costlier balance of system and more complex engineering, though Cadmus did not incorporate site use costs or site preparation expenses. Cadmus also modeled representative cases for floating solar in each electric distribution company's service territory and concluded that the additional costs associated with floating solar in New Jersey do not warrant a full 1.0 TREC factor. While the anticipated costs provided by [Lacey] for their project are greater than those modeled for the base case, Staff believes these are not characteristic of floating solar projects and that they do not justify a 1.0 factor.

[(Emphasis added).]

The BPU staff thus concluded:

Staff therefore recommends that the Board deny the petition. Staff encourages [Lacey] to consider [instead] the CSI Program for the project.

18

This Appeal and Lack of Mootness

Lacey then filed the present appeal. After the matter was briefed, this court inquired of counsel as to whether the appeal was moot because the 2019 TI program had apparently concluded. The parties responded with supplemental correspondence in which they agreed the appeal is not moot. As explained to us during the oral argument, Lacey and several other applicants to the 2019 program are still pending, and if Lacey were successful in reversing the BPU's 2023 final agency decision, Lacey could still be admitted into the program. In addition, counsel also clarified that the appeal does not depend upon appropriations from a previous state fiscal year, because the TREC formula is funded by payments from energy purchasers.

II.

On appeal, Lacey essentially contends the BPU's denial of its petition was arbitrary, capricious, and unreasonable. Specifically, Lacey argues in its brief that: (1) the BPU's denial of the project based upon an undisclosed and sudden requirement for "net metering," when the agency was aware of the grid-supply nature of the project for over two years, is arbitrary and capricious; (2) the other articulated reasons for the BPU's decision–including timing and litigation risk–are not proper foundations for denial; (3) the denial improperly functions as a

refutation and inappropriate repudiation of the State's solar program and policies; and (4) the denial of the 1.0 TREC factor based upon allegedly unrefuted submissions is arbitrary and capricious.

In considering these arguments, we apply well-established principles of appellate review in administrative agency appeals. In general, judicial review of administrative decisions is limited. We review only "(1) whether . . . the agency follow[ed] the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion" that could not reasonably have been reached. Bd. of Educ. v. M.N., 258 N.J. 333, 342 (2024) (alternations in original).

Moreover, specifically as to the judicial review of the BPU's final agency decisions, we recognize the breadth of the BPU's legislatively delegated powers and that particular agency's expertise in highly technical subjects within the domain of public utility regulation.

The BPU's powers and duties are set forth in Title 48, N.J.S.A. 48:2-13. Under that statute, the Board's authority to regulate utilities is broad. In re Centex Homes, LLC, 411 N.J. Super. 244, 254 (App. Div. 2009). "Our courts have consistently held that the Legislature in Title 48 intended to delegate the

widest range of regulatory power over public utilities to the [BPU]." <u>Ibid.</u> (alteration in original) (quoting <u>Deptford Twp. v. Woodbury Terrace Sewerage Corp.</u>, 54 N.J. 418, 424 (1969)). And indeed, "the BPU's 'rulings are entitled to presumptive validity.'" <u>In re Petition of N.J. Am. Water Co.</u>, 169 N.J. 181, 188 (2001) (quoting <u>In re Petition of Jersey Central Power & Light Co.</u>, 85 N.J. 520, 527 (1981)).

Furthermore, the BPU's authority "extends beyond powers expressly granted by statute to include incidental powers that the agency needs to fulfill its statutory mandate." <u>In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling</u>, 167 N.J. 377, 384 (2001) (quoting <u>In re Valley Rd. Sewerage Co.</u>, 154 N.J. 224, 235 (1998)).

"Because '[t]he grant of authority to an administrative agency is to be liberally construed to enable the agency to accomplish the Legislature's goals,' . . . we defer to '[t]he agency's interpretation . . . provided it is not plainly unreasonable.'" <u>Ibid.</u> (citations omitted). This is especially true when reviewing the agency's findings of fact, where appellate courts should not "substitute our judgment for that of the agency, particularly when that judgment reflects agency expertise." <u>Ibid.</u>

21

That said, "a reviewing court is 'in no way bound by [an] agency's interpretation of a statute or its determination of a strictly legal issue.'" Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 158 (2018) (alteration in original) (quoting Dep't of Child. & Fams., Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 302 (2011)). Questions of law remain questions for the court's de novo review. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Having applied these scope-of-review principles to the issues and record before us, we affirm the BPU's disposition of Lacey's petition, substantially for the reasons articulated in its final agency decision and the related staff recommendations. We amplify only a few aspects here.

A central theme of Lacey's appeal is its claim that the BPU acted arbitrarily by, in essence, encouraging developers of floating solar facilities to apply for the TI program but ultimately deeming its own floating solar project unsuitable for approval. We are unpersuaded that the BPU led Lacey down a proverbial "primrose path." As reflected in the language we quoted above, the BPU's orders launching the TI interim program did not promise that grid supply floating solar projects such as Lacey's would be eligible.

In fact, the BPU expressed caution about the uncertain feasibility and timing of such projects well before Lacey submitted its application. Notably, the only identified two floating solar projects the BPU approved for the TI program were both net-metering projects, not grid supply projects. That is an important qualitative difference. The BPU and its staff, supported by a consultant's report, reasonably found it would likely take longer than the allotted two years (without discretionary extensions) for Lacey to negotiate the necessary contracts with energy purchasers on the grid. That assessment, informed by the agency's expertise, was neither arbitrary nor capricious.

Lacey emphasizes that, as a private entrepreneur, it bore the financial risk of its investment failing if the project could not be completed within the regulatory deadline, and that no state grant funds were at stake. Even so, the BPU had the prerogative to prioritize approval of TI proposals that appeared to have better chances of success.

Beyond these concerns, the BPU also reasonably deemed problematic Lacey's uncertain full control of the project site, and the pendency of litigation that clouded viability. Although we were advised at oral argument the litigation and property control questions have since resolved, the status quo at the time of the final agency decision was a legitimate matter of agency concern.

We do not perceive that Lacey was treated unfairly during the process. It was given the opportunity to respond to discovery requests and clarify and amplify the merits of its application. The applicant did not take advantage of the waiver process set forth in the regulations. Although there was no obligation to pursue a waiver, the procedures existed. Regardless, we acknowledge that the BPU's decision was made with the assumption of a properly pursued waiver by the applicant and the application was nevertheless denied.

Also, we do not regard the BPU's rejection of this individual application to be a "refutation" of the State's solar energy policies. Not every proposed solar project must be approved. The BPU has wide authority to examine the merits of each such proposal, and to apply its regulatory expertise and judgment.

Additionally, as the BPU has pointed out, Lacey's rejection from the TI interim program does not preclude Lacey from applying for approval under the successor SuSI program, which is now in effect. Lacey submits that the payment formula under the SuSI program is not economically feasible given its projected project costs. Whether or not that remains true, we discern no arbitrary or capricious conduct that would justify a reversal of the final agency decision.

To the extent we have not addressed them explicitly, all other arguments raised on appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(D) and (E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0608-23